HOUSTON AND TEXAS CENTRAL R. W. CO. v. RUSSELL ADAMS.

1. RESPONSIBILITY OF RAILWAY FOR DELIVERY OF GOODS.—A railway company, as common carrier, is responsible for the delivery of goods shipped by it to the consignee; and the company is liable on delivery to any one else.

2. CHANGE OF LIABILITY BY RAILWAY TO THAT OF WAREHOUSEMAN.—The statute (Paschal's Dig., 445) altering the liability from that of common carriers to that of warehouseman, does not apply where no effort was shown to notify the consignee of the arrival of the goods shipped.

3. LIMITATION.—The statute of limitations will not run, in the absence of knowledge on part of the owner of the conversion of his goods, until a reasonable time elapses for ascertaining the facts.

4. SAME—FACT CASE.—Where goods were improperly shipped from Brenham, Texas, on 23d January, 1871, and were lost; the owner was residing near Bremond, in Texas, and brought suit February 6, 1873, there being no evidence of his actual knowledge: *Held*, That a verdict for plaintiff, disregarding the plea of two years' limitations, was properly found.

ERROR from Washington. Tried below before the Hon. I. B. McFarland.

February 6, 1873, Russell Adams, of Robertson county, Texas, brought suit in the District Court of Washington county against the Houston and Texas Central Railway Company for the value of two bales of bedding and one box sundries, of alleged value of $1,192, shipped on the railroad of defendant at Houston for Brenham. The plaintiff, Russell Adams, was emigrating from Georgia, and the goods in question were his household goods, put up carefully, and marked "R. Adams." They were shipped at Columbus, Georgia. Plaintiff accompanied the goods as far as New Orleans, Louisiana, where he last saw them. He there directed them to be forwarded to Bremond, Robertson county, Texas, his destination. Defendant's shipping agent received them January 12, 1871, and shipped them to Brenham, where they arrived January 19, 1871.

On authority of a letter written from Burton, and received by the defendant's agent at Brenham, signed R. Adams, the goods were forwarded, January 23, to Burton. There they were delivered, March 16, 1871, to a man calling himself Robert Adams, who had no bill of lading or receipt for same. He had lived in the neighborhood of Burton for several months before receiving the goods, and remained in the neighborhood several months after receiving them. He was a day laborer, a single man; received letters from Illinois; dug a well for an agent of the defendant at Burton, and borrowed from him to pay the freight and charges. This man had spoken of receiving the packages several days before their arrival at Burton. On receiving them, he receipted for them as "R. Adams."

Plaintiff demanded the goods at Bremond several times. (January 6, 7, 8, 9, 10, and 11, 1871.) He wrote to one Wilson, at Brenham, who also made demand at Brenham. Afterwards he sent his son, who made demand at Brenham and at Burton.

Other facts appear in the opinion.

*Sayles & Bassett*, for plaintiff in error.—Plaintiff in error insists that the judgment of the court below in favor of the defendant in error, for the value of the goods, is erroneous; that the liability of the plaintiff in error, under the facts of this case, was changed from that of a common carrier to that of a warehouseman, and that no such acts of negligence were shown as to render the defendant responsible for the loss of the goods.

The statute (Paschal's Dig., 455) provides "that railroad companies, having depots or warehouses for storing goods, shall be liable as warehousemen [are] at common law for goods, and the care of the same, if, after arrival at the point of destination, they shall use due diligence to notify the consignee, and the goods are not taken by the consignee, and have in consequence to be stored in the depots or warehouses of the common carriers." In the absence of the statute, the rule is the same at common law. (Garside *v.* Trent and Mersey Navigation, 4 Term R., 581; Hyde *v.* Trent and Mersey Navigation, 5 Term R., 389; McHenry *v.* Philadelphia, Wilmington and Baltimore Railroad, 4 Harrington, 448; Thomas *v.* Boston and Providence Railroad Company, 10 Met., 472; Norway Plains Company *v.* Boston and Maine Railroad, 1 Gray, 263.)

Notice to the consignee is excused when he cannot be found. (Fisk *v.* Newton, 1 Denio, 45; Ostrander *v.* Brown, 15 Johns., 39.)

The evidence in this case shows that the plaintiff was a resident of Bremond, in Robertson county, and never resided in Brenham or Burton, and the use of the utmost diligence would not have enabled the carrier to discover his proper address, no clue to which was given by the marks on the goods or otherwise. The goods were received at Brenham on the 19th of January, 1871, and stored in their warehouse, and afterwards were forwarded to Burton on the 23d of the same month, where they were again stored in the warehouse of the company until the 16th of March. The railroad com-

pany, from the time the goods were so placed in their ware-house, ceased to be insurers, and from that date were bound to take common and reasonable care of them. (Story on Bail., sec. 444.) Common and reasonable care is that which men of business usually exhibit in their own affairs, and is to be judged of by the habits of business and general usages of life. (Story on Bail., sec. 11.)

Applying this test to the delivery of the goods by plaintiff in error, on the 16th of March, to "R. Adams," whose name was marked on the goods, is there evidence of that want of "common and reasonable care" which would render the company responsible for their value to another "R. Adams," who, by a suit at law, has established his title to the property? The goods, as before stated, were marked "R. Adams." The full Christian name or residence, which would have aided in identifying the consignee, was not given. By a written order of "R. Adams," they were forwarded to Burton. Inquiry for the goods was frequently made at Burton before they came by a person well known in that community, where he had resided for months, as "R. Adams." Would a man of common and reasonable care, judged by the usual habits of business, have delivered the goods to the claimant under these circumstances? It is true, that if a warehouseman delivers the goods to a wrong person by mistake, he is liable to his bailor for their value. But that is when such delivery is made through negligence or want of care by the bailee, as in Willard *v.* Bridge, 4 Barb., 361, where the goods of Bridge were delivered to one Hurbert. The delivery of the property of one person to another of a different name, although by mistake, is evidence of the want of common and reasonable care; but the delivery of property marked with a particular name, to a person to whom that name belongs, is not such evidence. Would a man of common and reasonable care, according to the usual habits of business in this country, require from the claimant of property in his hands for delivery, other evidence than his identity with the name to which

the goods were consigned? In Sewell *v.* Evans and Roden *v.* Ryde, 4 Ad. & El., (N. S.,) 626, cited in 1 Greenl. on Ev., 575, it is held that the evidence of identity from the similarity of names, in an action at law, was *prima facie* sufficient.

The testimony shows that the rule was familiarly acted on by the business men of the State, and a departure from it would have been regarded as just cause of complaint.

In Chamblee *v.* Tarbox, 27 Tex., 139, it is said, by Mr. Justice Moore, that mere "similarity of name" affords evidence of identity. In that case the similarity of the given name of a married woman, with other circumstances, was sufficient evidence to establish a chain of title. If, then, identity of name is *prima-facie* evidence of identity of person, can the delivery to the person thus identified, especially when there were other circumstances, as the frequent inquiry about the goods, possession of a printed bill of lading therefor, &c., to support the conclusion, be said to be negligence? * * *

*Shepard & Garrett,* for defendant in error.—The railway company was clearly liable as common carrier.

The liability of a common carrier, by statute of this State, begins on the receipt of the goods, and continues until "the carrier at the point of destination shall use due diligence to notify the consignee, and the goods are not taken by the consignee, and have, in consequence, to be stored in the depots or warehouses of the company"; after this he becomes liable as a warehouseman. (Paschal's Dig., art. 455.) This is the rule at common law. (Morgan *v.* Dibble, 29 Tex., 118; Powell *v.* Meyers, 26 Wend., 591; Redfield's Am. Railway Cases, 133.)

Railway carriers are exceptions to the general rule of personal delivery, for they must necessarily stop at the depots on their respective routes, but in lieu of personal delivery, the law requires a notice, and nothing will dispense with that notice. (Michigan Central Railway *v.* Ward, 2 Mich., 538.)

There is no proof to show that any attempt was made to

notify plaintiff of the arrival of his goods at any point; not the slightest diligence is proved.     *     *     *

The company was responsible for the mistake of its receiving agent. (Meyer v. Chicago & N. W. R. R. Co., 24 Wis., 566.)

The case of Fisk v. Newton, 1 Denio, 45, relied on by defendants to excuse notice because the consignee could not be found, does not contemplate the fortuitous circumstance of absence that was developed in this case after the conversion of the goods by the defendants, but rests the excuse upon the ground of due efforts made to find. Neither do the circumstances nor the opinion in Ostrander v. Brown, 15 Johns., 39, warrant the deduction of counsel as to that case, but it does appear from it that a delivery to a cartman who had carted goods for consignees was not a sufficient delivery.

Storing the goods by defendants in their warehouse could not relieve them from their liability as common carrier, until due diligence had been used to notify the consignee of their arrival.

Defendants were bound also to deliver the goods to the proper owner. " Common carriers deliver property at their peril, and must take care that it is delivered to the right person; for if the delivery be to the wrong person, either by innocent mistake or through fraud of third persons, as upon a forged order, they will be responsible, and the wrongful delivery will be treated as a conversion." (McEntee v. The New Jersey Steamboat Co., 45 N. Y., 34; citing Hawkins v. Hoffman, 6 Hill, 586; Powell v. Meyers, 26 Wend., 290; Devereux v. Barclay, 2 Barn. & Ald., 702; Guillaume v. Hamburg and American Packet Co., 42 N. Y., 212; Duff v. Budd, 3 Brod. & Bing., 177; Blumenthal v. Brainerd, 38 Vt., 402.)

As to usage in Winslow v. The Vermont and Massachusetts Railroad Co., 42 Vt., 700, it was urged that the defendants could not, even as common carriers, be held liable for delivering the goods to the wrong party, if they deliver them in the customary manner and in the usual course of business.

The court say: " We think no such exception to the common-law rule can be made. The carrier is under the same contract obligation or duty to deliver the goods safely that he is to carry them safely. The law fixes these duties upon the carrier, and he cannot relieve himself from them by proving his usage."

In Stephenson *v.* Hart, 4 Bing., 476, a box addressed to J. West was sent to a person signing himself J. West to a letter requesting it to be sent to the " Pea Hen," a public house in St. Albans. The carriers were held liable to the plaintiff for its value.

The identity of name in Sewell *v.* Evans and Roden *v.* Ryde, cited in 1 Greenleaf on Evidence, 575, where there is no circumstance to raise a question, is something from which inference may be drawn. But these are cases where the parties are sought to be charged on contract, and the learned judge very pertinently answers the question why they should be required to prove a negative, that it would be so easily done. In this case, the beneficiary of the goods colluded with the defendants in establishing his identity, and thereby the real owner must be estopped from setting up a claim to them. John Smith's goods would be common property, with a tenure as uncertain as that of an umbrella or a green veil. * * *

Carrier may withhold the goods from the proper consignee until he obtains proper evidence of his identity. (Finn *v.* Western Railway Co., 102 Mass., 283; McEntee *v.* N. J. Steamboat Co., 45 N. Y., 34.)

2. If the court should believe that the verdict cannot be sustained on the first ground, it can readily be supported on the second.

The instruction to the jury was, that the liability of the carrier ceased if demand was not made in a reasonable time, and the liability of warehouseman began, and this responsibility was for " ordinary diligence," which was defined to be " such as a prudent man would use in the transaction of his own business." Under this charge, it was for the jury to say,

" under all the evidence in the case," whether or not this ordinary diligence had been exercised. (Morgan v. Dibble, 29 Tex., 120, 121.) Their verdict is in accordance with the facts and the law of the case. Warehousemen are responsible for delivery to wrong persons. (Devereux v. Barclay, 2 Barn. & Ald., 702.) Warehousemen are not only responsible for losses which arise by their negligence, but also for losses occasioned by the innocent mistake of themselves and of their servants in making a delivery of the goods to a person not entitled to them. (Story on Bail., sec. 450.)

We have seen, in Winslow v. The Vermont and Massachusetts Railroad Company, that the defendants, as carriers, cannot be relieved by proving their usage.

So the law fixes the duty of warehousemen; and because defendants were in the habit of delivering goods to well-known business men without requiring the production of a receipt, they cannot be excused for delivering them to a person comparatively unknown, and with no fixed place of residence or business. And the usage proved by the station agent, Van Hutton, was that freight was delivered only to well-known business men without requiring the production of a receipt. This is a general rule with railroad and express companies, and with banks.

No identification is required of well-known persons, and yet no strange or irresponsible person could receive a package or get a draft cashed without identification. * * *

*Sayles & Bassett*, in reply.—The plaintiff was guilty of contributory negligence, by marking the goods " R. Adams," and failing to designate with sufficient certainty the full name of the consignee.

In Congar v. C. & N. R. W. Co., 24 Wis., 157, an action for lost goods, the place of destination as marked upon the goods was " Iuka, Iowa." There were in the State of Iowa two towns named Iuka, one in Keokuk county, and the other in Tama county. It was held that the failure to state the

name of the county, or otherwise to indicate in what part of the State the Iuka intended was situated, was such negligence on the part of plaintiff as precluded a recovery. That was a far stronger case against the carrier than the case at bar; for there it was shown that the company's agents—not those, however, engaged in making the particular shipment, but others along the line of the road—knew the location of the Iuka intended and the station at which freight for that place should have been delivered; while here no such fact was alleged or proved.

Besides, the fact that there were two towns of the same name in the State might well be presumed to be known to the citizens thereof; while the fact that there were two men to whom the description " R. Adams" would equally apply could hardly be presumed, in absence of testimony charging the defendant with such knowledge.

But in the case at bar, by reason of the fault of the plaintiff and his agents at Galveston in forwarding, the place of destination was negligently given as Brenham, instead of Bremond.

Since our original brief was filed, the following additional authorities, in support of the proposition that identity of name is *prima-facie* evidence of identity of person, have fallen under our notice: Garwood *v.* Garwood, 29 Cal., 515; Thompson *v.* Manrow, 1 Cal., 428.

It seems clear, under the authorities, that upon the facts of this case the appellant's liability as a common carrier had been discharged before the loss, and that his liability after the loss was that of a warehouseman, and not a carrier.

The rule of ordinary diligence exacted of bailees in general, including warehousemen, is satisfied when the party acts on a *prima-facie* case.

To constitute the gross negligence necessary to charge them, they must have had actual knowledge, or have been charged with actual knowledge, of facts from which notice

might be fairly inferable.   Nothing of the kind appears in the case.

MOORE, ASSOCIATE JUSTICE.—By the contract upon which this action was brought, the plaintiff in error undertook and bound itself, as a common carrier, to safely carry from the city of Houston, in Harris county, and deliver at its depot in the town of Brenham, the goods for the value of which the defendant in error brought this suit.

It appears from the receipt given by the forwarding agent of plaintiff in error at Galveston, January 12, 1871, that the bales and box containing the goods to recover the value of which this action is brought were marked "R. Adams, Brenham, Texas"; but we cannot infer from the record that the identity or ownership of them by defendant in error was otherwise disclosed, or that the place of residence of the consignee was known to plaintiff in error, or its agents who forwarded or received the goods, either at Brenham or Burton, where they were lost.

The statement of facts shows that on the 19th of January, 1871, the goods arrived at Brenham, and were placed in plaintiff's depot at that place; but, on a letter from some one signing himself "R. Adams" requesting it, they were, on the 23d of the same month, forwarded to Burton, where they remained in plaintiff's depot until the 16th of March, 1871, when they were delivered to Robert Adams, who receipted for them by writing his name R. Adams in plaintiff's freight book, opposite the entry therein of said articles.   The Robert Adams to whom the goods were delivered is shown to have been about Burton for a month or two previous to the delivery of the goods to him, or it may be for that time prior to their arrival at Burton; and he remained there for several months subsequently.   He seems to have been an ordinary laborer.   His occupation during a part of the time was that of digging a well for one of defendant's agents or clerks at that place.   It is shown that he had frequently inquired for the

goods previous to their arrival, stating that they had been shipped to Brenham, but that he had requested defendant's agent at that place to forward them to Burton.

Subsequently to the delivery of the goods to Robert Adams at Burton, and probably a month or two after he had left there, the defendant in error, discovering that they had been forwarded, as we may infer, by mistake of the forwarding agent of the Morgan line of steamers at Galveston, (and who must be regarded as also defendant's agent,) to Brenham, instead of Bremond, demanded them of plaintiff in error at Brenham, and also at Burton, having previously made repeated applications for them at Bremond. Failing, however, to receive the goods at either place, on the 6th of February, 1873, he instituted this suit.

Admitting that the mistake in freighting the goods to Brenham, instead of Bremond, cannot be imputed to defendant, still it cannot be denied that defendant was bound as a common carrier to deliver the goods in Brenham to the real consignee to whom they in fact belonged, and that the delivery of them to any one else was a violation of the contract, which entitled the owner to an action for their value. The case of Winslow *v.* The Vermont and Massachusetts Railroad Company, 42 Vt., 700, is strictly in point, and fully sustains this proposition.

It is there said: "It has been urged, that the defendants cannot, even as carriers, be held liable for delivering the goods to the wrong party, if they deliver them in the customary manner and in the usual course of business. We think no such exception to the common-law rule can be made. The carrier is under the same contract, obligation, or duty to deliver the goods safely that he is to carry them safely. The law fixes these duties upon the carrier, and he cannot relieve himself from them by proving his usage. It is true, as urged, that it is not as customary for other carriers, as it is for express companies, to oblige themselves to look up the owner and consignee, and deliver the goods to him at his

residence or place of business. But all classes of common carriers are responsible, and equally responsible, for a loss of the goods by delivery to the wrong person." And says the court in McEntee v. The New Jersey Steamboat Company, 45 N. Y., 34: "Common carriers deliver property at their peril, and must take care that it is delivered to the right person; for if the delivery be to the wrong person, either by an innocent mistake or through fraud of third persons, as upon a forged order, they will be responsible, and the wrongful delivery will be treated as a conversion." Numerous other cases to the like effect might be easily cited, but it is unnecessary. The proposition is too elementary to require it. (Story on Bail., secs. 540, 543, 545b.)

It certainly follows, if the carrier is guilty of a conversion of the goods by delivering them to the wrong person, though he has acted in good faith and with due caution, he is equally so when he forwards them from their point of destination elsewhere on the order of any one but the party to whom they should have been delivered. (Stephenson v. Hart, 13 E. C. L., 596.) The consignee is entitled to receive his goods at the place where the carrier undertook and bound himself to deliver them, and is under no obligation to seek or demand them elsewhere. Nor can he be held bound by, or be supposed to have consented to, their improper shipment or delivery by the carrier, merely by following them to the point to which they have been improperly forwarded, or by demanding them from the party to whom they were wrongfully delivered.

But plaintiff in error maintains that its liability to defendant in error as common carrier, in respect to these goods, had ceased even before they were forwarded to Burton; and if not, it certainly had before they were delivered at Burton to Robert Adams. In order to determine whether plaintiff in error incurred any liability to the owner by forwarding the goods to Burton and delivering them after their arrival there to said Robert Adams, it is maintained that recourse must be

had to the law applicable to warehousemen, and not to that to which carriers are held subject. But let us see if it is true that defendant's liability as carrier for the delivery of these goods had ended before they were delivered to the pretended owner at Burton, or would when they were forwarded from Brenham.

When the course of business of the carrier is such as will not ordinarily admit of a personal delivery of the goods to the consignee, there seems to be some conflict in the adjudged cases as to the precise time and circumstances when the liability of the carrier as such ceases and that of warehouseman begins; but whatever difficulty may be found in determining this point at common law or in reconciling the different decisions regarding it, is eliminated in this State by statute, by which it is clearly and definitely determined.

Section 4 of the act concerning common carriers, and defining their liabilities in certain cases, (Paschal's Dig., art. 455,) reads as follows, to wit: "Railway companies and other common carriers having depots or warehouses for storing goods, shall be liable as warehousemen as at common law for goods, and the care of the same, stored in such depots or warehouses before the commencement of the trip or voyage on which said goods are to be transported; but shall be liable as common carriers from the commencement of the trip or voyage until the goods are delivered to the consignee at the point of destination. If the carrier at the point of destination shall use due diligence to notify the consignee, and the goods are not taken by the consignee, and have in consequence to be stored in the depots or warehouses of the common carriers, they shall thereafter only be liable as warehousemen."

Evidently, by the plain language of this statute, the common-law liability of the carrier continues until the goods are delivered to the consignee, unless due diligence has been used by the carrier to notify him of the arrival of his goods, and he has failed to take them away. What are the essential facts constituting the diligence required by the statute, must

obviously depend in some degree upon the facts and circumstances of each case in which it is to be shown, and upon the custom and usage of business at the place of delivery. (Blumenthal *v.* Brainerd, 38 Vt., 402.) But we need not speculate in this case as to what are the essential facts which must be shown to establish the fact that due diligence had been exercised to notify the consignee of the arrival of his goods, as there is no pretense that any effort whatever was made to ascertain defendant's residence, or to give him notice of their arrival at their point of destination. If any effort at diligence had been made, it might have been necessary to pass upon its sufficiency; but as none whatever was used, or even attempted, there can be no reasonable pretense that defendant did not continue to hold the goods as carrier. (Michigan Central Railroad Co. *v.* Ward, 2 Mich., (Gibbs,) 538.)

But if defendant's liability was merely that of warehouseman, would the facts shown in the record have justified the forwarding of the goods from Brenham, or the subsequent delivery of them to a party in whom the evidence fails to show anything more than a mere pretense of right to them? While a warehouseman may no doubt be fully justified in many instances in delivering freight to well-known and responsible business men residing in the immediate vicinity of the place to which goods are sent, we think there can be no hesitancy in saying that it was gross negligence to deliver goods of the description and value of these to a man without family, or settled place of residence, or permanent occupation, who held no receipt or bill of lading for them; and this, too, in the absence of facts or circumstances of any kind tending to show that he either owned or had any connection with them, except his statement, before the arrival of this particular freight, that a lot of freight belonging to him had been shipped to Brenham, and that he had ordered it forwarded to Burton, and the bare fact of the similarity of his surname and the initial letter of his Christian name with that of the consignee; and certainly nothing whatever is shown to have

warranted defendant in forwarding the goods from Burton. It does not appear that defendant's agents knew, or had even ever heard, prior to the receipt of his letter, that such a person as "R. Adams" was residing there, or could rightfully lay any claim to these goods.

The only remaining question is,—Was the action barred by limitation when the suit was brought? There is no pretense that it was, unless defendant was guilty of a conversion of the goods when they were forwarded to Burton on the order of R. Adams; but if so, certainly the statute would not begin to run against plaintiff until he had notice of their conversion, or the lapse of time had been sufficient to charge him with notice of it. It is not pretended that plaintiff is chargeable with actual knowledge of the conversion in time to complete the bar before the commencement of his suit; and certainly we cannot say that the mere lapse of time from the 23d of January to the 6th of February is sufficient to raise a presumption that he must have known of the conversion of the goods, which we must do before we can reverse the judgment on this ground. When actual knowledge of the conversion is not shown, the statute cannot commence to run against the consignee before it was his duty to apply for the delivery of the goods. The time within which the owner is bound to apply for or demand them, evidently depends upon the terms of the contract under which they were freighted, the usual length of time required to transport freight from the place of delivery to its point of destination, the reasonable course of business at the place of its delivery, and other attending circumstances. These facts and circumstances, however, were not developed or exhibited upon the trial, as they should have been, by defendant, upon whom the affirmative of this issue rested. Whatever, therefore, may be the real facts, the evidence before them would not have warranted the jury in finding the action barred.

There is no error in the judgment, and it is therefore

AFFIRMED.