\*The Southern Express Co. v. Oskamp, Nolting & Co.

1. Contract of Common Carrier.

The contract of a common carrier is not that he will ascertain the owner of goods, and deliver them to him, but that he will deliver the goods according to directions; that is, at the place of destination, and to the party designated to receive them or to his order.

2. Delivery of Goods by a Common Carrier.

Where two men of like name live in the same town, and one orders goods from a distant dealer, who ships them in the common name, simply; in the absence of notice to the contrary, the party giving the order is, in contemplation of law, the one to whom they are sent. Consequently, delivery to him will be a due execution in that particular of the contract of carriage, although the consignor believed the order was from, and intended the goods to go to, the other man. The result is not varied by the circumstance that the purchaser fraudulently assumed the name used in buying, provided it is that by which he was known at the place of destination, unless negligence be shown; and this, the mere fact that delivery was not refused by the carrier, until inquiry could be made of the shipper as to which party the goods were designed for, fails to establish.

This was an action by Oskamp, Nolting & Co. against the Southern Express Co., in the Ross county common pleas, to recover $562.50, the value of diamond ear-rings and pins, which they allege the Express Co. received from them March 15, 1895, and was in possession of at Hopkinsville, Kentucky, as a common carrier for hire, for the purpose of delivering to one T. M. Jones, in that place, and which at that date, they aver, it wrongfully converted to its own use "by delivering the same to parties unknown" to said O. N. & Co., "and who were not the parties to whom the goods were directed and shipped."

Upon issues made as to this alleged conversion, the case was submitted to the court for trial, the finding and judgment being for the plaintiffs. The defendant filed its motion for a new trial, on the ground that the finding was not sustained by the evidence, which was overruled, exceptions duly taken, and the cause brought into this court by a petition in error. There were special findings of law, and fact in the common pleas. A bill of exceptions is also in the record, containing all the evidence, from which it appears that the essential facts are not in dispute. Concisely stated, they are as follows: In the town of Hopkinsville, Ky., lives a man named T. M. Jones. At the time of the transactions in question he was in the "general merchandise business." Oskamp, Nolting & Co. are dealers in jewelry, at Cincinnati, O. About March 13, 1895, one Abe Rothchilds, on his way to Hopkinsville, wrote and mailed to O., N. & Co., an order, in these words: "Hopkinsville, Ky., 3-13, 95. Mess. Oskamp, Nolting & Co., Cin., O., Gents: I have an order for a pair of diamond earrings, solitaires, each stone to weigh about 1 1-2 carats, to be white, well cut and perfect. Please send by express on memorandum several pairs and will return promptly those not wanted. I presume the mercantile agencies will be able to inform you as to my responsibility. You may also send a ladies' brooch or lace

* This case was dismissed by the Supreme Court for failure to file printed record, February 1, 1898. 5 Legal News, 127.

7    Dec.    27

pin, something neat, not to cost over $40. Yours respectfully, T. M. Jones. I would like to make 10 per cent. margin on the above if possible." This was written on a plain sheet, without any business card or heading such as is common with dealers. Upon receipt of the letter, O., N. & Co. looked into a commercial agency's book, found the name and business of T. N. Jones, the merchant at Hopkinsville, Ky., that he was rated at worth $20,000, credit good, and without further inquiry, shipped the goods it called for, under the mistaken belief that the order they were filling had been given by him. Mr. Jones was a stranger to them, with whom they had had no previous dealings. The goods were of the kind and value alleged, but, aside, from the fact that the package containing them was received by the Express Co. from a firm known to it as dealers in jewelry, no knowledge of their character or value was given to or had by it. The package was shipped as ordinary freight, at a cost of 25 cents for the carriage, the lowest rate at which the Express Co. takes the least valuable article. Had the true value of the consignment been known to the Express Co., the mode of carriage would have been different, to insure greater safety, and the cost of transportation materially larger. R. reached Hopkinsville, stopping at a hotel there, March 13th, the day the order for the diamonds was sent ; and he remained in the town until afternoon of the 15th, going while there by the name of T. M. Jones. The merchant, Jones, met him, and he spoke of their having the same name, and of his purpose to go into the jewelry business in that place. The letters of the two got mixed in delivery at the P. O., and Mr. Jones took several, and also a telegram, wrongly given him, to R. The latter went so far as to get a room, and put a card on the door, visible to passers by, saying the room would be "occupied by Tobias M. Jones as a jewelry store about March 25th." He also presented himself at the Express Co.'s office as T. M. Jones, and showed the agent letters in his possession so addressed. He asked further for a package there, sent in that name, and to identify himself as the person to whom it was forwarded, described what it should contain so fully, that upon opening it the agent was convinced of his right to receive the package, and delivered it to him. R. further stated to the express agent that he was looking for goods from various parties, of whom he gave a list, naming this Cincinnati firm as one. Before the package, he identified, was delivered to him, it had been offered to the merchant, Jones, who refused to take it, saying it was not his. The facts as to letters wrongly got by the latter, which were given over to R. were stated by Jones to the delivery man—all of which the express agent learned before he delivered the package in question. At the time he got it, also R. told him of renting a room, and showed the keys to it. The express agent testifies that he made the delivery to R. because he had left a list with him with Oskamp, Nolting & Co.'s name on it, and said that he had goods ordered from them, and T. M. Jones, the dry goods merchant, had refused a package for this T. M. Jones, and the latter was at hand to receive the goods he said he had ordered from O., N. & Co., on the arrival of the express. It further appears that O., N. & Co. knew nothing of R.'s having made the order filled by them, and they delivered the package to the Express Co., intending it for T. M. Jones, the merchant. It was addressed thus : "T. M. Jones, Hopkinsville, Ky." No mark beyond this was on it, or direction given by the shippers, indicating that it should go to the merchant rather than some other T. M. Jones, who might be at that place. R., when he demanded and got the package, showed no letter from O., N. & Co., relating

to it, or bill of lading for the goods; nor did the agent of the Express Co. attempt to communicate with them before the delivery was made

SIBLEY, J.

The facts stated, are the basis for two points of contention. The first is, that the delivery of these goods to a person not intended by the consignors, was *per se* a conversion, notwithstanding he had ordered them, and at the place of destination went by the name in which they were shipped. But if this consequence be held not to follow simply from thus delivering the goods, the second proposition is that such negligence is shown to have accompanied the act as in law to work the same result, and so make the Express Co. liable for their value.

I. "Common carriers deliver property at their peril, and must take care that it is delivered to the right person, for if the delivery be to the wrong person, either by an innocent mistake, or through the fraud of third persons, as upon a forged order, they will be responsible, and the wrongful delivery will be treated as a conversion." *McEntee* v. *N. J. S. Co.*, 45 N. Y., 37.

In determining, however, who is the right person, in case of an alleged wrongful delivery, it is to be borne in mind "that the contract of the carrier is not that he will ascertain who is the owner of the goods and deliver them to him, but that he will deliver the goods according to directions. If a man sells goods to A., and by mistake directs them to B., the carrier's duty is performed if he delivers them to B., although the unexpressed intention of the forwarder was that they should be delivered to A." *Samuel* v. *Cheney*, 135 Mass., 281. The doctrine so stated is also asserted by the supreme court of the United States, in different words, but with equal explicitness. "The undertaking of the carrier to transport goods necessarily includes the duty of delivering them. They are to be delivered at the place of destination to the party designated to receive them if he presents himself, or can with reasonable efforts be found, or to his order." *North P. R. R.* v. *Com. Bank*, 123 U. S., 734.

The principles thus brought into view are in ordinary cases decisive, and in a vital feature show the ground for a decision of the controversies arising upon this record. The single question left open is in respect to their application where, as here, the directions for delivering goods, or designation of the party to receive them, describes either o two persons, one of whom gave the order for and got the goods, while the consignors mistakenly supposed they were selling and shipping them to the other.

Disregarding the other circumstances, a right of recovery in this action is first predicated upon the proposition that the intention of the shippers is the controlling fact, and hence a delivery in contravention of it, was a conversion of the goods by the Express Co. For this contention *Cundy* v. *Lindsey*, 3 App. Ca., 465, is cited. But the case is not in point except upon the assumption that, in order to exempt the Express Co. from liability, the delivery must have passed the title to Rothchilds. It was not a controversy of the shipper with the carrier, but between him and a party that bought the goods of an imposter who got possession of them under circumstances very like those here involved, and the House of Lords ruled that as it was never the intention of the consignors to sell or send them to the imposter, the title did not pass. Consequently the purchasers were held in trover for their value. That is not the question for decision here, however, "because," says a court of great authority, commenting on *Cundy* v. *Lindsey*, *supra*, in a case before

it, at all fours with this, the "liability" of the "common carrier does not necessarily turn upon it." *Samuel* v. *Cheney*, 135 Mass., 278. Nor is the Cundy case aided at this point by anything in *Hamet* v. *Letcher*, 37 O. S., 356. The controversy there in no way touches the questions decided in *Samuel* v. *Cheney*, *supra*, nor is it intimated that the rule of the English adjudication would be applied to a case like this. Neither, therefore, as we think is relevant to the question now under consideration. Closer, perhaps, in its application is *Pacific Ex. Co.* v. *Shearer*, 160 Ill., 215 S. C., 52 Am. St., 324, also relied upon. This was decided by a divided court, and the facts are materially different from those before us. There, a telegram for $4,000 was sent by an imposter to Shearer, in the name of a responsible person with whom the latter had dealings. Believing it genuine, he sent the money by an Express Co., whose agent delivered it to the man who had wired for it, at the place of destination, which, however, was not the residence of the one whose name had been fraudulently used. The Express Co. was held liable for a wrongful delivery. The decision seems to be upon the ground that the money was obtained by forgery, and so the same principle would apply as in the case of delivery got by forging the name of a consignee. It possibly may stand, also, upon the carrier's negligence. In either view, it is distinguishable from this case, which, in the aspect now presented, clearly falls into the class holding that "if two men of the same name live in the same town, and one of them orders goods from merchants at a distance, and the carrier delivers the goods to the man of that name who had really made the order, the carrier is not to be held responsible simply because the consignor thought his order was from the other of the two men." *Wilson* v. *Ad. Ex. Co.*, 27 Mo. App., 360; *Samuel* v. *Cheney*, 135 Mass., 278; 9 Am. St., 514. This conclusion is also well supported by " the principle of equity that where one of two innocent parties must suffer from the fraud of a third, the loss should fall on him who enabled such third party to commit the fraud." *Hamet* v. *Letcher*, 37 O. S., 356, 359; *Dean* v. *Yates*, 22 O. S., 388, 396.

II. On the remaining question as to negligence in delivery how stands the case with reference to the facts? Rothchilds was known in Hopkinsville as T. M. Jones. The merchant resident there was of the same name. The designation in the terms of shipment therefore was alike applicable to either of the two. One had given the order on which the goods were sent, and to him, after inquiry sufficient to satisfy of that fact, the agent of the Express Co. delivered them. As against the carrier, then, upon what ground of justice can the shippers say that T. M. Jones whose order they received and acted on is not the party " designated to receive them." His name was not fictitious. The case therefore is manifestly the same as it would be, had it been Rothchild's true name, and two T. M. Joneses, one of whom recently came to the place, were there. Now is it reasonable to permit the consignors to unload the loss primarily caused by their mistake respecting the person with whom they dealt, upon the carrier who finds that party, and without notice of the error, delivers the goods to him? We think not. And emphatically so, when the conduct of Oskamp, N. & Co. is taken into account. They were strangers to T. M. Jones, of Hopkinsville, save as by the book of a commercial agency they found him to be there in the " general merchandise business." Had they in view of that fact, addressed the package to him with the descriptive addition of " merchant," or " dry-goods dealer," instead of the naked name of T. M. Jones, the case would be quite differ-

ent. Besides, we cannot doubt that by a precaution so simple as this, and one which, under these circumstances, ordinary business prudence clearly dictates, the scheme of fraud would have been frustrated, and all serious loss prevented. Apparently then, there is much better ground for predicating a wrongful delivery upon negligence of the shipper than of the carrier. Or, looking at the facts in another view, the consignors are by their own acts estopped from saying that the goods were not given to the party designated to receive them. Against this, however, it is urged that had the express agent refused a delivery until he could communicate with the consignors, the fraud would have been exposed, and loss avoided. His failure to do so is therefore said to be a lack of care which will make the carrier liable. But allowing that in this instance the course suggested might have been effectual in defeating the scheme by which Rothchilds got the goods, was it the agent's duty to pursue it? There is nothing to show that he had reason to suspect the good faith of R., who in fact was the T. M. Jones that ordered, was expecting, and demanded the goods. If it turned out that he was entitled to them, the refusal to deliver, even if qualified, might subject the company he was serving to an action for their conversion, *McEntee* v. *N. J S. Co.*, 45 N. Y., 34. Now, as a practical matter of business is it just, or required by sound policy, that after finding the purchaser, who answers also to the description in the directions of the shippers, their undisclosed intention shall compel the carrier to assume such a burden, with its contingent liabilities, or be responsible to them as for a wrongful delivery? On the facts presented by this record, in our opinion, not. While in some instances that obligation might arise, the grounds for it are not here apparent. Nor does this case fall within the rule of decisions in which, where a purchaser has personated some fictitious person to whom the goods were addressed, and the carrier delivered them to a stranger without inquiry as to who or what he was, simply upon their being asked for, it has been held liable on the ground of negligence. 9 Am. St., 514; *Price* v. *O. R. R. Co.*, 50 N. Y., 213; *Winslow* v. *Vt. R. R. Co.*, 42 Vt., 700; *S. Ex. Co.* v. *Van M.*, 17 Fla., 783; *H. R. R. Co.* v. *Adams*, 49 Tex., 748. The discussion need not, however, be prolonged. In a case covering this like a blanket, the opinion contains a passage which so strongly expresses the proper view to be taken of the controversy here, that we transcribe it. There, an imposter assumed the name of one A. Swanick, residing at Saratoga Springs, as Rothchilds did that of T. M. Jones, of Hopkinsville, and thus was enabled to obtain a delivery of goods exactly as R. succeeded in doing. In an action against the carrier, for a wrongful delivery, recovery was denied the consignor, the court saying: "Suppose upon the arrival of the goods in Saratoga Springs, the impostor had appeared and claimed them; to the demand of the defendant upon him to show that he was the man to whom they were sent, he replies: 'True, there is another A. Swannick here, but he has nothing to do with this matter; I am the one who ordered and purchased the goods; here is the bill of the goods, and here is the letter notifying me of their consignment to me.' The defendant would be justified in delivering the goods to him, whether he was the owner or not, because he had ascertained that he was the person to whom the plaintiff had sent them. It is true the defendant did not make these inquiries in detail; but if, by a rapid judgment often necessary in carrying on a large business, he became correctly satisfied that the man to whom he made the delivery was the man to whom the plaintiff sent the goods, his rights and liabilities are the same as if he had

pursued the inquiry more minutely. The plaintiff contends that he intended to send the goods to Arthur Swannick. It is equally true that he intended to send them to the person with whom he was in correspondence. We think the more correct statement is that he intended to send them to the man who ordered and agreed to pay for them, supposing erroneously that he was Arthur Swannick. It seems to us that the defendant, in answer to the plaintiff's claims, may well say, we have delivered the goods intrusted to us according to your directions, to the man to whom you sent them, and who, as we were induced to believe by your acts in dealing with him, was the man to whom you intended to send them; we are guilty of no fault or negligence." *Samuel* v. *Cheney*, 135 Mass., 281. The able note by Mr. Freeman, 9 Am. St. 513, in which he analyzes the adjudications upon the liability of carriers for "delivery to a wrong person," and classifies them by their different facts, agrees with the result at which we arrive in a case like this. To the same effect is *Lake, etc., R. R. Co.* v. *Luce & Co.*, 5 Circ. Dec., 145.

Our conclusion obviously renders consideration of the amount of recovery, which might arise upon a different holding, wholly needless.

We are compelled to say, then, that the finding below is not sustained by the evidence.

The judgment of the common pleas is therefore reversed, and a new trial awarded.

*Arthur A. Clark*, Chillicothe, and *Gholson & Cabell*, Cincinnati, Attorneys for Plaintiffs.

*A. B. Cole*, Attorney for Defendants.