THE PACIFIC EXPRESS COMPANY

*v.*

WILLIAM W. SHEARER *et al.*

*Filed at Ottawa January 20, 1896—Rehearing denied March 13, 1896.*

1. CARRIERS—*of goods are insurers of safe delivery.* A carrier is an insurer of the safe delivery of the goods to the person to whom they are consigned.

2. SAME—*fraud and imposition will not excuse delivery.* A carrier can not escape liability on the ground that deception, imposition or fraud was resorted to by an impostor to obtain from the agent of the carrier the goods entrusted to his care.

3. SAME—*delivery of money package by express company to impostor— liability.* An express company is not relieved from liability for the delivery of a package of money to an impostor representing that he is the consignee, by the fact that such impostor telegraphed for such money in the name of the consignee and a reply to the latter was delivered to such impostor, and that the sender of the money believed that the telegram was from the person by whom it purported to have been sent.    (PHILLIPS, J., dissenting.)

*Shearer* v. *Pacific Express Co.* 43 Ill. App. 641, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

Appellees had, for a number of years prior to the happening of the circumstances giving rise to this case, conducted business at the stock yards in Chicago under the firm name of W. W. Shearer & Co. For some time prior to April 22, 1889, said firm had dealings with one J. C. Stubblefield, who was engaged in buying stock in Kansas, Missouri and Texas, and who, from time to time, applied to Shearer & Co. for advances of money, which they sent him in the form of drafts, letters of credit, and money by express. In April, 1888, Stubblefield was in Chetopa, in Kansas, and telegraphed appellees for $700, and it was sent to him by draft, and he was identified at

the bank and received the money on the draft. Stubble-field was acting for himself in the purchase of cattle, and not as an agent for appellees. On April 21, 1889, about midnight, this J. C. Stubblefield arrived at Chetopa, Kansas. He got off the train and went to a hotel a short distance from the depot, but did not register his name, giving as a reason that he was tired and wanted to go to bed. At the same time and from the same train another man got off at Chetopa, and went to a hotel farther from the depot than that to which Stubblefield went. This man subsequently claimed to be also named J. C. Stubblefield. The real J. C. Stubblefield next morning met an acquaintance in the town and took a ride with him in a buggy, and some time during the afternoon left Chetopa on a freight train, for Parsons, and went from there to Coffeyville. The other man, whom we shall designate as the impostor, went to the telegraph office in Chetopa and sent the following telegram:

"CHETOPA, KAN., *April 22, 1889.*
"*To. W. W. Shearer & Co., Union Stock Yards, Chicago:*
"Express me $4000 to-day, Chetopa. Answer.
J. C. STUBBLEFIELD."

The impostor had not registered at the hotel at which he stopped, which was kept by one Davenport. After having sent the above telegram to the appellees he returned to the hotel and said: "Mr. Davenport, if a telegram should come here to J. C. Stubblefield, if there are any charges on it you pay it and I will settle with you." Davenport asked him if that was his name, and he replied in the affirmative. Davenport then informed him that a messenger boy had been there with a telegram for J. C. Stubblefield, and told him where he could find the boy. Soon after the impostor informed Davenport that he had received the telegram. This telegram was the answer from W. W. Shearer & Co. to the message sent them in the morning, and was as follows:

"UNION STOCK YARDS, CHICAGO, ILL., 22.

"*To J. C. Stubblefield:*

"Sent money as ordered to-day.   Wire me full particulars on receipt of this.

W. W. SHEARER."

In reply the impostor sent the following:

"CHETOPA, KAN., 22.

"*To W. W. Shearer & Co.:*

"Bought 240 corn fed Texas, top of 300, at $20 a head.

J. C. STUBBLEFIELD."

During the afternoon of April 22 the impostor had given orders to the railroad company for eleven stock cars to be set on the track for his use, for the purpose of carrying cattle to be shipped by him on the 24th of April.   The cars were ordered from the railroad company in pursuance of such arrangement, and were by the company placed on the side-track at Chetopa, ready for the use of the man known to them as Stubblefield.   He informed Davenport that he was buying cattle to ship from Chetopa, and that he was expecting money from Chicago with which to pay for them; that he had ordered the money from plaintiffs by telegraph.   On the morning of the 24th he called on the agent of the appellant express company and asked if there was a package there for Stubblefield.   The agent asked him if his name was Stubblefield, to which he replied, "It is."   Being asked what were his initials, he replied, "J. C."   The agent then said there was a package for J. C. Stubblefield, and asked, "What identification have you?"   He then took from his pocket two accounts of sales and a telegram and handed them to the agent.   The telegram was the one signed by Shearer & Co. and addressed to J. C. Stubblefield at Chetopa, a copy of which is above set out.   The accounts of sales showed transactions between J. C. Stubblefield and appellees, and that the latter had sold in Chicago cattle consigned to them by J. C. Stubblefield.   The agent then asked the impostor, "Is there any body here that you are

acquainted with?" The man replied, "Nobody except the landlord." The impostor then brought in Davenport, and stated he had come after the package. The agent inquired of Davenport, "Are you acquainted with this gentleman?" and he responded, "I am." The agent said, "Who is he? What is his name?" and Davenport replied, "J. C. Stubblefield." The agent then said, "How do you know that is his name?" and Davenport answered: "At least that is the only name I ever knew him by. Besides, he has been stopping at my house several days—nearly a week. He is also on a trade with some parties west of town for some stock. He has got the cars ordered. They are on the track at the depot." The agent then asked the impostor, "What are you looking for?" He said, "A package of money." Said the agent, "How much?" and he answered: "Four thousand dollars, from W. W. Shearer & Co., Chicago, Illinois." The agent then delivered the package of money to the impostor, he receipting for it as J. C. Stubblefield, and Davenport signing his own name as identifying Stubblefield. The impostor then directed Davenport to retain a room for him, as he would be back that night, but took a train for Coffeyville, and was not thereafter seen in Chetopa. The real J. C. Stubblefield left Coffeyville on April 24 and came to Chicago, and at once called at the office of appellees, when it was for the first time discovered that a fraud had been consummated, and steps were taken to stop the delivery of the package, but it was then too late.

JAMES FRAKE, and W. W. MORSMAN, for appellant.

BARNUM, HUMPHREY & BARNUM, for appellees.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

On the trial in the circuit court before the court, without a jury, the court held as law ten propositions submitted by the appellees and refused four propositions submitted by the appellant. The ruling of the court on

the propositions submitted led to a judgment in favor of the appellees, the plaintiffs in the action, and that judgment was affirmed in the Appellate Court. When this case was first submitted we were inclined to reverse the judgment and remand for another trial, but upon a petition for a rehearing, on a further consideration of the case, we have reached a different conclusion.

Appellees' third and fourth propositions held were as follows:

3. "To relieve the defendant from legal liability in this action it is not enough that the evidence should prove that the man to whom the defendant's agent at Chetopa delivered the package in controversy was in fact the man, and was sufficiently identified to said agent as the man, whose telegram to the plaintiff in evidence caused them to send by express, as they did, the package in question.

4. "The defendant in this case, on receiving the package in controversy addressed to J. C. Stubblefield, Chetopa, Kansas, became, as common carrier, an insurer of the safe delivery of said package to J. C. Stubblefield, Chetopa, Kansas, and nothing except the act of God or of the public enemy could discharge the defendant from the duty of so delivering it."

Appellant's first refused proposition was as follows:

"If the defendant's agent delivered the package in controversy to the identical person in response to whose telegraphic order the plaintiff sent the same, in good faith, believing such person was J. C. Stubblefield and the person named as consignee, and if, at the time of the delivery of the package in controversy, the defendant's agent correctly ascertained that the person who demanded it and to whom it was delivered was the identical person in response to whose order the plaintiff sent the same, and that plaintiffs had accepted the order of such person and acted upon the same as the order of J. C. Stubblefield, and if, before the delivery of the package in contro-

versy, the defendant's agent made reasonable efforts and exercised reasonable and ordinary care and diligence to ascertain the identity of the person who demanded the delivery and to whom the delivery was in fact made, and then made such delivery without knowledge or reason to believe that the person to whom such delivery was made was not the person to whom such package was addressed, then the plaintiffs can not recover in this action, and the finding and judgment must be for the defendant."

It is apparent from the record that the package was delivered to the person in response to whose telegraphic order appellees sent the package, appellees at the time believing such person to be J. C. Stubblefield; and it is no doubt also true that at the time of delivery the agent of appellant ascertained that the person who demanded the package, and to whom it was delivered, was the person in response to whose order appellees sent the same, and that appellees treated the order for the money as the order of J. C. Stubblefield; and it may also be true that the agent used reasonable diligence to ascertain the identity of the person who demanded the package before it was delivered. Would these facts relieve the carrier of liability for delivering the package to a person to whom it was not consigned?

In Hutchinson on Carriers (sec. 344) the rule with reference to delivery is stated as follows: "No circumstance of fraud, imposition or mistake will excuse the common carrier from responsibility for a delivery to the wrong person. The law exacts of him absolute certainty that the person to whom the delivery is made is the party rightfully entitled to the goods, and puts upon him the entire risk of mistakes in this respect, no matter from what cause occasioned, however justifiable the delivery may seem to have been or however satisfactory the circumstances or proof of identity may have been to his mind, and no excuse has ever been allowed for a delivery

to a person for whom the goods were not directed or consigned."

In *United States Express Co.* v. *Hutchins*, 67 Ill. 348, where an action was brought against the express company for its failure to deliver a package of money left with it to be carried and delivered, this court said in regard to the liability of the company (p. 350): "They became insurers for its safe delivery. Being so, nothing can excuse them from their obligation safely to carry and deliver, but the act of God or the public enemy. This rule of the common law, the rigid application of which has given so much satisfaction and security to the commerce of nations, is properly invoked in cases like this."

In *Baldwin* v. *American Express Co.* 23 Ill. 120, where an action was brought against the company to recover the value of a package of money which it, as common carrier, undertook to carry from Chicago to Madison, Wis., and deliver to a certain named person, it was held to be the settled doctrine of England and of this country that there must be an actual delivery to the proper person, and in no other way can the company discharge itself of responsibility as a common carrier, except by proving that it has performed such engagement, or has been excused from the performance of it, or been prevented by the act of God or the public enemy. After citing authorities in support of this position it is said (p. 123): "It is necessary, in order to give one security to property, this rigid rule should obtain, and it has for years been enforced against common carriers. They are considered as insurers, and are under that responsibility." In *Gulliver* v. *Adams Express Co.* 38 Ill. 503, the rule announced in the case last cited was sanctioned and approved.

In *American Merchants' Union Express Co.* v. *Milk*, 73 Ill. 224, an action was brought against the company to recover for a package of money delivered to the company in DuPage county, to be forwarded to Kankakee. When the package arrived at its destination the agent of the

company delivered it to a certain person on a forged order of the consignee. It was held that it is the duty of an express company, upon receiving a package of money to be forwarded, to safely carry and deliver it to the consignee, and the only way it can relieve itself from responsibility as a common carrier is by showing performance, or its prevention by the act of God or the public enemy, and that it is not discharged by delivering the same to another on a forged order of the owner. The same doctrine is announced in *American Merchants' Union Express Co.* v. *Wolf*, 79 Ill. 430.

The decisions of this court are believed to be in harmony with the law as declared in the text books and as announced by a large majority of the courts of last resort of the country. The law requires at the hands of the carrier absolute certainty that the person to whom the delivery is made is the real person to whom the goods have been consigned, and the carrier cannot escape liability on the ground that deception, imposition or fraud may have been resorted to by an impostor to obtain from the agent of the carrier the goods entrusted to its care. The business interests of the country, as well as the rights of a consignor who pays a liberal price for the transmission of his property, alike demand that the carrier should be held to a strict accountability.

There are a number of cases in the books where a delivery of goods has been made by the carrier to the wrong person under circumstances not unlike the facts under which the money was delivered here, where the carrier was held liable. In *American Express Co.* v. *Fletcher*, 25 Ind. 493, a person pretending to be J. O. Riley called on the telegraph operator and agent of the express company and sent a telegram to plaintiff requesting a certain sum of money by express. In a short time the same agent received by express a package of money addressed to J. O. Riley. The person who had sent the telegram for the money called on the agent and operator and demanded

the package of money, which was delivered over to him. Subsequently it turned out that the person who sent the telegram and to whom the money was delivered was not J. O. Riley, and the express company was held liable for the money. In the decision of the case the court, among other things, said: "The express undertaking of the appellant was to deliver the package to J. O. Riley *in person.* The utmost that the answer alleged was, that the delivery was to another person who pretended to be Riley. He identified himself merely as having so pretended on the day before, by transmitting a telegram in Riley's name. This was no better evidence that his name was Riley than if he had so stated to the express agent or any third person. That the package had been sent in response to a telegram purporting to be from J. O. Riley simply proved that Riley had credit, or some arrangement with the plaintiff to furnish him money, and that the package was sent to him,—not that he was the person who sent the dispatch or that any one pretending to be him was to receive it."

*Southern Express Co.* v. *Van Meter,* 17 Fla. 783, is another case in point. There an instruction had been given which was, substantially, that the express company, without reference to the party who may have ordered the money sent or who may have telegraphed for it, was bound to deliver to the plaintiff if it was sent to him and he was the owner. On behalf of the express company it was insisted that the instruction did not announce a correct rule of law, but the court held otherwise, and said: "This instruction, viewed in reference to the testimony, is nothing more than that a forged telegram is no excuse for the delivery to a party not the owner and to whom it was the contract of the carrier to deliver it. * * * Notwithstanding the forged telegram, this carrier, in making a personal delivery, was bound by law to deliver to the person to whom the package was addressed, he being its true owner. It is the settled doctrine of England and

this country that there must be an actual delivery to the proper person, * * * and in no other way can the carrier discharge his responsibility, except by proving he has performed such engagement or has been excused from performance, or been prevented by the act of God or a public enemy." See, also, *American Express Co.* v. *Stack*, 29 Ind. 27.

*Price* v. *Oswego, etc. Co.* 50 N. Y. 213, is an interesting case on the question. There the person who ordered the goods in the name of a fictitious firm, S. H. Wilson & Co., was the same person who received and receipted therefor in the name of such fictitious firm. It seems that the referee found "that the delivery by the carrier was to the same person who made the order for the goods," and he also found, as a conclusion of law, that the delivery to such person, without notice of fraud, relieved the carrier of liability. But the Court of Appeals reversed the judgment and held the carrier liable, and among other things said: "It would hardly be claimed, in case there had been a firm doing business at Oswego under the name of S. H. Wilson & Co., a swindler would make himself consignee of goods, or acquire any right whatever thereto, which were in fact consigned to such firm, simply by showing that he had forged an order in the name of the firm directing such consignment. If he would not thereby acquire any right to the goods, delivery to him would not protect the carrier any more than if made to any other person."

*Duff* v. *Budd*, 7 Eng. C. L. 399, is also a case in point. There the person who received the goods was the same who ordered them in a fictitious name, but it was held the carrier had no authority to deliver them to such person and the owner was entitled to recover of the carrier.

*Dunbar* v. *Boston, etc. Co.* 110 Mass. 26, and *Edmunds* v. *Merchants, etc. Co.* 135 id. 283, are relied upon by the appellant to sustain the delivery of the package. In the first case cited, one John F. Gorman called on Dunbar,

in Boston, and represented that he was John H. Young, of Providence, Rhode Island. He purchased on credit a quantity of goods and had them consigned to John H. Young, Providence, Rhode Island. Upon the arrival of the goods in Providence, Gorman, who had made the purchase in person, presented himself to the carrier, and, as the agent of Young, demanded the goods. The goods having been delivered to him, Dunbar sued the carrier for a misdelivery, but the court held that the action would not lie. The decision, as we understand it, is predicated on the ground that the goods were consigned and delivered to the person who actually, in person, made the purchase under an assumed name. In the other case it appeared that "a swindler, claiming to be Edward Pape, of Dayton, Ohio, purchased goods from plaintiff by personal negotiation. There was a man whose true name was Edward Pape, in Dayton, Ohio,—a reputable business man, who the plaintiff supposed the swindler to be. The goods were delivered by plaintiff to the defendant, to be carried to Dayton and delivered to Edward Pape. The defendant delivered to the swindler." The court held that the carrier was not liable. In the opinion the court said: "The sale was voidable by the plaintiff, but the carrier, by whom they were forwarded, had no duty to inquire into its validity. The person who bought them, and who called himself Edward Pape, owned the goods, and upon their arrival in Dayton had the right to demand them of the carrier. In delivering them to him the carrier was guilty of no fault or negligence. It delivered them to the person who bought and owned them, who went by the name of Edward Pape, and thus answered the directions upon the package, and who was the person to whom the plaintiff sent them." There is a marked distinction between these cases and the one under consideration, and they cannot control here.

Another case relied upon is *Samuel* v. *Cheney*, 135 Mass. 278. That case, in its facts, is more like the one under

consideration than any that has been cited by appellant, and it seems to sustain the position of appellant. But while we recognize the ability of the court in which the case was decided, we do not regard the rule laid down as the correct one, and we are not inclined to follow it.

Some other cases have been cited in the argument of counsel, but it will not be necessary to refer to them here. The cases bearing on the question are not entirely harmonious, but the rule adopted in this State and in the courts of many other States, that the carrier is an insurer for the safe delivery of the goods to the person to whom they are consigned, is, as we think, the only safe rule to be adopted. This rule gives protection to the consignor, who pays his money to the carrier to transport and deliver goods to the consignee, and at the same time imposes no unreasonable responsibility on the carrier. When money or goods have been delivered to a carrier to be carried and delivered to a certain named person, when they reach their destination it is the business of the agent of the carrier to deliver to the real person to whom they are consigned, and, as said by Hutchinson, no circumstance of fraud, imposition or mistake will excuse the common carrier from responsibility for a delivery to the wrong person. Where the consignee is unknown to the agent of the carrier, it is his duty to hold the goods until the consignee furnishes ample proof that he is the person to whom the goods were consigned. When Shearer & Co. received the telegram from J. C. Stubblefield, and forwarded a package of money directed to J. C. Stubblefield, they supposed and believed the order came from the man with whom they had previously had dealings and with whom they were personally acquainted, and when they delivered the package to the carrier it was consigned to him. The fact that an impostor had sent a telegram in the name of J. C. Stubblefield, and a reply to J. C. Stubblefield was returned which was delivered to the impostor, did not authorize the agent of the carrier to deliver

the package directed to J. C. Stubblefield to an impostor representing that he was J. C. Stubblefield. Here the package of money was consigned to J. C. Stubblefield, and the carrier was directed to deliver the money to him and to him only. This was not done. The money was never delivered to J. C. Stubblefield, but the agent of the carrier delivered it to an impostor, and for a failure to deliver the package to J. C. Stubblefield the carrier is liable.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE PHILLIPS, dissenting:

I cannot concur in the views held by the majority of the court on this record. The rule of law is well settled that the carrier must deliver the goods carried, to the person to whom they are consigned. No fraud or imposition practiced upon the carrier, and no mistake of the carrier or its agent, however satisfactory the circumstances of identification may be, will relieve the carrier. The law requires a delivery to the person to whom the goods are shipped, and the carrier assumes the entire risk of mistake in respect to the identity of the person to whom a delivery may be made. That requirement makes the carrier insurer for safe delivery to the consignee of the goods carried, and no excuse can prevail for a delivery to another than the consignee. (*United States Express Co.* v. *Hutchins,* 67 Ill. 348; *Baldwin* v. *American Express Co.* 23 id. 120; *American Merchants' Union Express Co.* v. *Milk,* 73 id. 224; *American Merchants' Union Express Co.* v. *Wolf,* 79 id. 430; *Gulliver* v. *Adams Express Co.* 38 id. 503.) The duty thus imposed upon the carrier is discharged when it delivers the goods to the person to whom the consignor sent them.

The facts in this record show that appellees, acting on a telegram purporting to have been sent by one J. C. Stubblefield, forwarded by appellant, from Chicago, Illi-

nois, to J. C. Stubblefield, at Chetopa, Kansas, the sum of $4000, which was delivered by the carrier to the person who sent the telegram. The person who sent the telegram is shown to have called himself J. C. Stubblefield, and was, during the short time he remained in Chetopa, so known and called. He was not there known or called by any other name. What other residence he may have had is unknown, so far as the evidence shows, as is also the fact whether that was his real name. It is apparent, from the evidence, his purpose was to defraud the appellees. In reply to the telegram requesting appellees to send money by express and answer the same, the request therein made was complied with and the money forwarded. It does not appear that any directions were imposed upon the carrier as to any investigation as to the sender of the telegram, and no contract made further than that arising under the law, which created the relation and duty between consignor, carrier and consignee. The sender of that dispatch was also answered, as requested, and particulars asked for by appellees, and particulars were furnished by another telegram from the same person who sent the first, which were satisfactory to appellees. No investigation was made by the consignors as to the personality of the sender of the dispatch, and none by them asked of the carrier, further than what the law imposed as a duty on it. So far as the consignor was concerned, it was intended, at the time the consignment was made, that the money should be delivered to the sender of the dispatch. That intention grew out of the fact that the consignors had done business with one J. C. Stubblefield, in whom they had confidence, and, believing that he was the sender of the dispatch, they acted on it without investigation. They acted upon and complied with it, intending delivery to be made to the person sending it. The person who sent the telegraphic order is the identical person in response to whose order the money was sent, and was the person who demanded the

consignment and made proof as to his identity and to whom the goods were delivered.

It is said in Hutchinson on Carriers (sec. 344):  "No circumstances of fraud, imposition or mistake will excuse the common carrier from responsibility for delivery to the wrong person. The law exacts of him absolute certainty that the person to whom the delivery is made is the party rightfully entitled to the goods, and puts upon him the entire risk of mistake in this respect, no matter from what cause occasioned, however justifiable the delivery may seem to have been, or however satisfactory the circumstances or proof of identity may have been to his mind, and no excuse has ever been allowed for delivery to a person to whom the goods were not intended nor consigned. If, therefore, the person who applies for the goods is not known to the carrier, and he has any doubt as to his being the consignee, he should require the most unquestionable proof of his identity, or if, from any cause, he should have a reasonable doubt as to whether the person claiming the goods was entitled to them, he should refuse delivery to him until he established his right. If, however, the delivery be made to the wrong person, whether by innocent mistake or through fraud practiced upon the carrier, such wrongful delivery will be a conversion."

This is the true rule of law. Express companies have so many opportunities to do wrong, so many temptations are spread before their employees, and such is the necessity for intrusting them, that every presumption should, of right, be against them, and should prevail unless rebutted. The law imposes upon common carriers the very strictest liability to carry, and safely deliver to the proper person, goods and valuables entrusted to them. This strict liability should in all proper cases be rigidly enforced and in no way lessened. Nor will the law recognize an excuse by which it may be avoided. But while it is true that no fraud or imposition practiced upon the carrier will relieve

or excuse it from responsibility for delivery to the wrong person, yet I am not prepared to go to the extent of holding that the carrier is responsible for loss occasioned by fraud practiced upon the consignor, when the carrier itself has used due diligence, care and caution, and is free from negligence. If a fraud is perpetrated upon the consignor by reason of ingenious tricks or devices, or because of a want of care on his part, the carrier does not become a party to that fraud, nor does any liability accrue against it by doing the only thing the consignor intended should be done. As is said as to the liability of express companies in *United States Express Co.* v. *Hutchins, supra:* "They become insurers for safe delivery; being so, nothing can excuse them from their obligation safely to carry and deliver but the act of God or the public enemy." But the carrier is not an insurer against fraud being perpetrated upon the consignor. The opinion of the court here extends the liability of the carrier to the extent of making it an insurer against fraud perpetrated upon appellees. No negligence is shown on the part of appellant to create a liability against it. No fraud or mistake on the part of the carrier is shown. The fraud that was perpetrated was on the consignor, and not on the carrier.

The case of *American Express Co.* v. *Fletcher*, 25 Ind. 492, is cited as directly in point, sustaining the views of the majority. In that case the only question before the court was as to the sufficiency of the second and third paragraphs of the answer, to which demurrers were sustained, and it was held the answer did not set up that the consignment was delivered to the person to whom it was sent. That was the only question before the court. As a pleading the answer set up no defense, and the demurrer was properly sustained.

Most of the cases in which carriers have been held by the courts liable have been based almost solely upon the ground of negligence. The carrier is, under all circum-

stances, being a bailee, bound to exercise due diligence in the performance of its undertaking, and it is always essential, where the plaintiff seeks to recover upon the ground of negligence, that it has performed its duty with due diligence.

In the case of *Duff* v. *Budd*, 3 Brod. & B. 177, the impostor ordered by mail, under the assumed name of James Parker, goods to be shipped by the carrier and delivered to James Parker in High street, Oxford. There was no James Parker in High street, but there was a William Parker, whom the consignor erroneously believed to be the person who ordered the goods. When the goods arrived at their destination they were offered to William Parker, but he declined them. Subsequently the carrier delivered the goods to a man who demanded them, and who was known to the carrier as Mr. Parker, but not as James Parker nor of High street, and without any information that he was the same person who ordered the goods from the consignor. In this case the judgment was for the plaintiff, but was based upon the finding of negligence. PARK, J., said in the opinion: "The real question was whether the defendant and his servants had been guilty of gross negligence in the delivery of the parcel."

In *Stephenson* v. *Hart*, 4 Bing. 476, the impostor in person ordered goods from the plaintiff, who delivered them to the carrier consigned to "J. West, No. 27 Great Winchester street, London." The carrier was unable to find such a person on that street, and found house No. 27 was vacant. A week or more later the carrier received a letter signed "J. West," requesting the carrier to re-ship the goods to the "Pea Hen," a public house at St. Albans. Without any direction to this effect from the consignor the request was complied with, and the impostor received the goods without further identification than his ability to state the contents of the package. In this case the consignor recovered, but the recovery was on the ground

that the carrier had been guilty of gross negligence in the performance of its undertaking.

In *Price* v. *Oswego, etc., Co.* 50 N. Y. 213, the swindler ordered goods by mail from the plaintiff, signing the name of S. H. Wilson & Co. to the order. The plaintiff complied with the order and sent the goods by the defendant, as above. There was, in fact, no such firm as S. H. Wilson & Co. Soon after the arrival of the goods a person called upon the carrier and asked if the goods had arrived, and learning they had, offered to and did pay the freight charges, whereupon the goods were delivered to him upon his signing a receipt for them. The carrier had no knowledge or information whether the person to whom the delivery was made was the person who signed the order for the goods and with whom the consignor had dealt as with the true consignee. They were delivered without any evidence of identity whatever, and such delivery was an act of gross negligence on the part of the carrier.

In the case of *Samuel* v. *Cheney,* 135 Mass. 278, an impostor, during the time he remained at Saratoga Springs, bore the name of A. Swannick. He rented a house or shop, secured a box at the post-office, and had letter-heads printed with his name, upon which was also given the number of his post-office box, all for the purpose of perpetrating the swindle. There was a reputable merchant in Saratoga Springs named Arthur Swannick, who carried on his business in the name of A. Swannick. The swindler ordered a bill of goods from the plaintiff in Boston, signing the name of A. Swannick, and the plaintiff forwarded the goods by defendant, as carrier, believing the letter was from the reputable merchant, consigning the goods to A. Swannick, Saratoga Springs. At the same time the plaintiff sent a bill for the goods addressed to "A. Swannick, post-office box 1595," that being the box of the swindler, which, of course, went to him. On the arrival of the goods they were delivered to the swindler without any identification, except that the carrier had

previously delivered a package of cigars at his shop. Action was brought against the carrier on the ground that this was a misdelivery, but the court held that the delivery was good. The court in that case said: "The defendant would be justified in delivering the goods to him whether he was the owner or not, because he had ascertained that he was the person to whom the plaintiff had sent them." To the contention of the plaintiff that he intended to send the goods to Arthur Swannick, the court answered: "We think the more correct statement is that he intended to send them to the man who ordered and agreed to pay for them, supposing, erroneously, that the man was Arthur Swannick. It seems to us that the defendant, in answer to plaintiff's claim, may well say, 'We have delivered the goods intrusted to us, according to your directions, to the man to whom you sent them, and who, as we were induced to believe by your act in dealing with him, was the man to whom you sent them. We are guilty of no fraud or negligence.'"

In *Edmunds* v. *Merchants, etc. Co.* 135 Mass. 283, goods were purchased from plaintiff by one claiming to be Edward Pape, of Dayton, Ohio, by personal negotiation. There was a reputable business man in Dayton named Edward Pape, and plaintiff supposed he was dealing with him. The goods were delivered by plaintiff to the defendant carrier, to be transported to Dayton and delivered to Edward Pape. Delivery was made to the swindler. In the opinion the court says: "The sale was voidable by the plaintiff, but the carrier by whom they were forwarded had no duty to inquire into its validity. The person who bought them, and who called himself Edward Pape, owned the goods, and upon their arrival in Dayton had the right to demand them of the carrier. In delivering them to him the carrier was guilty of no fault or negligence. It delivered them to the person who bought and owned them, who went by the name of Edward Pape, and thus

answered the directions upon the package, and who was the person to whom the plaintiff sent them."

In the case of *Dunbar* v. *Boston, etc. Co.* 110 Mass. 26, one Gorman presented himself in Boston to Dunbar, representing that he was John H. Young of Providence. In the name of Young he purchased goods and had them consigned by the defendant carrier to "John H. Young, Providence, R. I." On the arrival of the goods Gorman pretended to the carrier that he was the agent of John H. Young, and secured the delivery of the goods. Dunbar sued for a misdelivery. The opinion of the Supreme Court says: "The plaintiff sold the gin and whisky which are the subject of this action to a person calling himself John H. Young of Providence, and delivered them to the defendants to be carried to the same person in Providence by the same name. As he was the only person in Providence who bore that name there was no other individual to whom the defendant could deliver the property, and delivery to him would be a performance of the contract."

There are numerous cases arising upon commercial paper which adopt the same rule as held in the foregoing cases. Among these are *Palm* v. *Watt*, 7 Hun, 318; *Kohn* v. *Watkins*, 26 Kan. 691; *United States* v. *National Exchange Bank*, 45 Fed. Rep. 163; *Hoge* v. *First Nat. Bank*, 18 Ill. App. 501. In the latter case a person stopping transiently at a hotel in Chebanse, Ill., gave his name as William Robbins. He procured an application for a loan, distributed by one Sanford, to be filled out in the handwriting of one Trescott, who was known to Sanford, and signed the name "William Robbins" to the application. With the application was an abstract of title to land lying near Lockport, Ill., showing title in William Robbins, Jr. The loan was made by one Hoge, and note and mortgage executed in the name of William Robbins. The money was remitted by draft payable to William Robbins, which this person procured to be cashed. There was no evidence whether his real name was Robbins or not, but there was

a William Robbins living near Lockport who owned the land but had nothing to do with the transaction. The entire business was conducted between Sanford and the impostor by mail. Hoge sued the bank that cashed the draft on the ground that it had been paid on a forged endorsement. The judgment was in favor of the bank. The court in the opinion says: "The record shows that there was, at the time the fraud in this case was perpetrated, a man at Chebanse who was known in that place, so far as he was known at all, by the name of William Robbins. There is nothing to show that such was not his true name,—no evidence that he was ever known anywhere by any other name. * * * He, in the name by which he was known to Sanford and Hoge, executed the note and mortgage which formed the consideration for the draft, and there is not the slightest doubt that they intended the draft should be paid to the identical individual with whom they had corresponded, and who executed the note and mortgage for which it was given." So in the present case, there is no evidence that the name of the party to whom delivery was made was not in fact J. C. Stubblefield, although not the same J. C. Stubblefield whom plaintiffs knew. He had been at a hotel in Chetopa four days, representing that to be his name, and sent and received telegrams and ordered cars in that name. He was known there by this name only. This was *prima facie* evidence of his true name, and he, being the only person in Chetopa bearing or claiming that name, would satisfy the directions for delivery, and thus put upon the plaintiffs the burden of proof of showing that the delivery was not made to a person named J. C. Stubblefield, or that the defendant company was guilty of negligence.