WESTERN UNION TELEGRAPH CO. *v.* GOODMAN.

(Division A. Feb. 20, 1933.)

[146 So. 128. No. 29758.]

D. W. Houston, Sr. and Jr., of Aberdeen, for appellant.

786

Magruder, Walker & Magruder, of Starkville, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The Western Union Telegraph Company appeals from three adverse judgments against it in favor of the appellee, L. N. Goodman.

Goodman sued for the recovery of three separate sums of money, in separate actions, alleged to have been deposited with the agent of appellant at Starkville, Mississippi, to be transmitted by appellant by money order, transfers, or telegrams over its lines. These suits were consolidated by order of the court, and the evidence heard in one trial. The instructions of the court and the verdicts of the jury being rendered according to the facts of each case, the judgments were separate in reality, although all included in one.

In stating the facts, we shall refer to the cases as case No. 1, case No. 2, and case No. 3. On January 6, 1928, Goodman delivered to the telegraph company's agent at Starkville one thousand dollars to be transmitted and delivered to W. M. Steward at Houston, Texas; in case No. 2, on February 1, 1928, Goodman delivered to the agent of the telegraph company two thousand dollars to be transmitted to the same party at the same place; in case No. 3, on March 19, 1928, Goodman delivered to the telegraph company's agent six hundred dollars to be transmitted and delivered to W. M. Steward, 1 Montgomery street, Jersey City, New Jersey. We shall state more fully case No. 2 as to the delivery of two thousand dollars to W. M. Steward at Houston, Texas, as that case is more fully developed than the others, and is the one in which the facts are most favorable to the appellant. The three telegrams were denominated by the company as "vigilant transfers," or messages for the delivery of money received at one point to be delivered to an individual on positive identification at a different and distant destination.

The several sums of money were delivered to the agent of the telegraph company at Starkville, Mississippi, on the following contract: "Positive evidence of personal identity is not to be required from the Payee, and I authorize and direct the Telegraph Company to pay the sum named in this order at my risk to such person as its agent believes to be the above named Payee, unless the following is signed. Positive personal identification required. I desire that the above named payee shall be required to produce positive evidence of personal identity before payment is made. Signature L. N. Goodman."

The message accompanying the two thousand dollars remittance delivered to the telegraph company by Goodman on February 1, 1928, is as follows: "Pay to W. M. Steward, care Perpetual Oil and Royalty Co., Second National Bank Building, Houston, Texas, Two Thousand

Dollars and no cents ($2,000.00), and deliver the following message to payee at the time of payment: Confirming telephone conversation remittance for four thousand shares Perpetual fifty cents many thanks. Signature. L. N. Goodman.''

Prior to the date of the transactions here referred to, Goodman had for some time transacted some business by mail with the brokerage firm of W. M. Steward & Co., located first in New York, and later at the above address in Jersey City; and in the course of that business, more than a year prior to these transactions, he had had personal correspondence with W. M. Steward, whom he had never seen. He had received letters signed by W. M. Steward in response to his letters relative to business transactions. These letters with the genuine signature had been lost. He offered in evidence a circular letter as to bond investments, signed with a rubber stamp, or other facsimile device, ''W. M. Steward,'' which he testified was the same signature as attached to letters received by him. He also offered in evidence responsive letters purporting to have been written by W. M. Steward, and signed by him, from Spokane, Washington, and Reno, Nevada, addressed to him and to his attorney, relative to Steward giving a deposition in this case. In these letters Steward directed that the interrogatories to be propounded and taken in his deposition be forwarded to a certain notary public at a certain address, or to him, and said that he would there give his answers. His deposition was taken before the named notary public at the place specified in his letter. Goodman, his attorney, and a banker of experience gave their testimony that the signature of W. M. Steward to these letters, written in contemplation of these suits, was the same signature as that of W. M. Steward affixed by rubber stamp or other device to the circular letter. They further testified that the several signatures of W. M. Steward on the three drafts paid by the telegraph company to some person

were not the genuine signatures above indicated, and in fact testified that the several signatures on the draft were each different and not the genuine signature of the same person. All of the original of these signatures are in the record before us.

It appears that some person in Houston, Texas, communicated with Goodman by telephone and telegraph offering him a bargain in the stock of the Perpetual Oil & Royalty Company, and on the same day or the succeeding day Goodman applied to the telegraph company in Starkville to have the several sums of money transferred and paid, under the contract, to W. M. Steward. Goodman had never seen Steward, had never heard his voice, and says that, in order to protect himself, he delivered his money to be transferred by the telegraph company and delivered upon positive identification, as indicated by the contract above set forth. As a result of these several orders, he never received any stock of the company or anything else of value. Goodman testified that prior to these transactions in controversy he had purchased stock of that company, upon which he had already realized fifty per cent., the company being in bankruptcy, and was assured of further collection. It quite clearly appears that Goodman was of the opinion that Steward of Steward & Co. had swindled him, and not until after a protracted investigation did he have cause to change his opinion. In other words, he thought the money delivered to the telegraph company had been delivered to the proper party, who had defrauded him.

The deposition of W. M. Steward, taken before a notary public at Reno, Nevada, is an emphatic denial that he had any communication with L. N. Goodman on the several dates, that he was in Houston, Texas, and that he received any money from the telegraph company. It stated that he was the same W. M. Steward who had a year or two before had business transactions with L. N. Goodman, and that not only had he no knowledge of the

transactions, was not in Houston, Texas, at the time, but had not authorized anyone to so act for him. He had been in Texas some time prior to these transactions, and had some dealings with this oil company. The gist of all of plaintiff's testimony was that the money delivered to the telegraph company for transfer to W. M. Steward at Houston, Texas, had been paid out to an impostor, and, in consequence of the telegraph company's failure to have positive identification as required by the contract, he had lost the entire sums so delivered, and, further, that this was in violation of the stipulation that, if the money was not delivered to the payee within seventy-two hours it would be refunded to Goodman.

After the suit was filed, the appellee, Goodman, propounded certain interrogatories to the telegraph company seeking to elicit information as to exactly what was done in each case with his money. These interrogatories were answered to the effect that the telegrams were in good faith delivered to W. M. Steward, who was known to the agent at Houston, Texas, and to the office of W. M. Steward at Jersey City, New Jersey. The agents of the company who swore to the answers of these interrogatories professed to know personally what transpired at all the several points at all times. At Houston, Texas, it had been the custom to deliver similar telegrams for other persons to the office of the Perpetual Oil & Royalty Company at the Kress building, because of the request of the stenographer of Noonan, president of said company, that they be delivered at the Kress building instead of at the National Bank building as addressed. These interrogatories contained some argument, and appeared to be answers on information and belief. The agents who answered the interrogatories never professed to be the messengers who delivered the telegrams and the drafts, and the evidence of the messengers who delivered the telegrams is not in this record.

As to the delivery of the two thousand dollars in case

No. 2, Miss Ellison was the manager of the JD branch office of the telegraph company in Houston, Texas, and received the two telegrams promptly. In case No. 1, the telegram was sent to the Kress building instead of the National Bank building for the reason indicated, and she does not know to whom the draft for the money, which she wrote and executed for the company, was delivered; but as to case No. 2 a man by the name of Berne appeared and requested that she deliver the draft for two thousand dollars to him. She declined, and told him that Steward would have to be identified. He remarked that Steward would be in the next day and would attend to the matter himself. On the following day Berne and the alleged Steward appeared in her office and requested the delivery of the two thousand dollar draft. She informated Steward that he must be identified, and declined, in effect, to accept Berne's identification. She had known Berne less than thirty days, knew that he was receiving money under similar conditions with reference to the same oil company, and regarded him as a man of worth and integrity, and said he was so regarded, but she could only name a florist next door who had so informed her. This man Steward had been introduced to her prior to January 1st by Berne as W. M. Steward of W. M. Steward & Co., Jersey City, New Jersey. She furnished to Berne and the alleged Steward an identification blank to be signed by Doherty, vice-president of a bank two doors from the telegraph office, on which blank was space for personal identification and a blank for Doherty's signature. According to her testimony, and Doherty's, Doherty drew his pen through the words "For identification only," had the man supposed to be Steward write his name, and wrote underneath, "Witness to above signature. Doherty." Berne and Steward returned with that blank, and delivered it to Miss Ellison, whereupon she delivered the telegraph company's draft on the bank, payable to W. M. Steward, for two thousand dollars,

which draft is indorsed on the back, "W. M. Steward," "Lawrence Berne." At the time this draft was delivered there were six employees in the telegraph office and telephone communication between the office and the bank, which was only two doors distant. Doherty said he had cause to suspect Berne, and therefore struck out the words "For identification only," and executed his signature as witnessing the signature of the man who claimed to be Steward.

None of the circumstances attending the delivery of the one thousand dollars draft at Houston, Texas, or the six hundred dollar draft at Jersey City, New Jersey, are shown, although the record shows plainly that they were delivered to some one. The two drafts delivered at Houston, Texas, were indorsed in manifestly different handwriting by W. M. Steward, and further by Lawrence Berne in manifestly the same handwriting. The Jersey City draft was indorsed by W. M. Steward, in an entirely different handwriting from either of the Houston, Texas, signatures, and was further indorsed by W. M. Steward & Co. by printed stamp.

W. M. Steward, in his Reno, Nevada, deposition, testified that he had theretofore sold his business in Jersey City, New Jersey, and had severed his connection therewith more than a year prior to these transactions with W. M. Steward & Co., and he had not authorized anybody for him personally to receive any telegram or to execute his indorsement on any draft; and that he was not in New Jersey on the date of the delivery of the money there and did not receive same.

The telegraph company introduced a book of rules which contained a list of its money transfer offices and certain rules and regulations, mainly instructions to its agents, with reference to the delivery of money "on caution," and on "vigilant transfer." There was no effort to show that these particular rules had been ap-

proved by the Interstate Commerce Commission. There were two hundred and eleven of such rules.

Answers were made to interrogatories propounded by the appellee to the appellant by its agents John Nalesnyk and A. H. Reiss. The court excluded, on objection of appellee, that part of these answers which clearly disclosed that the answers were not of personal knowledge and were hearsay, with reference to the manner in which the telegrams were delivered. Neither of them claimed to be the messenger who delivered the telegrams, and their answers included an argument for the telegraph company, quoting literally some of the pleadings.

There are many assignments of error set forth by the appellant, but the main one is addressed to the contention that the telegraph company had delivered the money to the man with whom Goodman had been in telephone communication and to whom Goodman intended to have the money delivered. The cases were submitted to the jury on the issue of whether or not the money had been delivered to W. M. Steward, resulting in verdicts for the full amounts demanded in each.

1. It is insisted that the court below erred in excluding that part of the answers to the interrogatories by Nalesnyk and Reiss, which were made on information and belief, and not shown to be of their personal knowledge. We can see no objection to the action of the court. The answers of the witnesses so excluded were plainly hearsay, and the parties did not claim to have been present and to have witnessed the transactions. The answers, in brief, are statements of facts accumulated by the company from all sources and sworn to by the witnesses on information and belief.

2. It is insisted that the court below erred in permitting the witnesses Page, Magruder, and Goodman to testify to comparison of handwritings, because the stencilled signature to the circular was not admitted to be the genuine signature of W. M. Steward of 1 Mont-

gomery street, Jersey City, New Jersey. The witnesses were permitted to testify that the signatures on the drafts paid by the telegraph company to the alleged Steward, by comparison with this circular and the letters written by Steward of Reno, Nevada, to Goodman and Magruder, were not the same handwriting. They had never seen Steward write. Goodman testified that he had carried on correspondence with Steward of New Jersey in a business way, and had received letters purporting to have been signed by W. M. Steward, and that the letters which were lost were signed in the same handwriting as the circular. Steward of Reno, Nevada, swore positively that he did not sign the drafts. The evidence was cumulative. We will not reverse the case for this reason, as the jury had the drafts paid to alleged impostor, and it is quite evident that the handwriting on the three drafts is each a separate and different handwriting. In fact, none of the signatures urged by the telegraph company as being the genuine signature of W. M. Steward are in the same handwriting, and the jury as nonexperts would reach that conclusion. We do not deem it of importance in this case to determine the question. Of course, the general rule is that a signature must be proven to be, or admitted to be, the genuine signature before it can be compared with some other in dispute. It is strange that it was agreed in this case that Steward of Nevada and other witnesses need not sign their depositions.

However, if this be not sufficient answer, the evidence, so far as the ground of objection urged here, was competent. One who has written letters to the purported author of the disputed signature, and received replies thereto, on which both have acted, is a competent witness to testify as to the genuineness of the disputed signature. See 6 Ency. on Evidence, p. 373, and note. Also see Southern Express Co. v. Thornton, 41 Miss. 216. This is true, although the witness testifying as to the hand-

writing never saw the writer and could not testify from having seen him write. See Southern Express Co. v. Thornton, supra.

3. Section 195 of the Constitution of 1890 declares telegraph and other companies to be common carriers in their respective lines of business, and that they are subject to liability as such. The business transacted in these cases was interstate, but our attention is not called to any statute or rule of the Interstate Commerce Commission which changes the status of this telegraph company as a common carrier. The condition here sharply presented is that, if a party imposed upon Goodman, the telegraph company really carried out his intention by paying the money to the party with whom he communicated, and whom he did not know and had no way of knowing, and therefore the court below erred in not giving instructions to the jury to that effect.

This is a new question in this state, and there is a dearth of authorities on the precise point. This being a common-law state, the rule at common law as developed should be applied by us. In 2 Hutchinson, Carriers (3 Ed.), section 668, page 739, the common-law rule is aptly stated as follows: "Excuses for nondelivery—Neither fraud, imposition nor mistake will excuse delivery to wrong person—No circumstances of fraud, imposition or mistake will excuse the common carrier from responsibility for a delivery to the wrong person. The law exacts of him absolute certainty that the person to whom the delivery is made is the party rightfully entitled to the goods, and puts upon him the entire risk of mistakes in this respect, no matter from what cause occasioned, however justifiable the delivery may seem to have been, or however satisfactory the circumstances or proof of identity may have been to his mind; and no excuse has ever been allowed for a delivery to a person for whom the goods were not directed or consigned."

Let it be remembered that in case No. 2, the only case

in which the circumstances of the delivery are explained in the evidence, the telegraph company had been paid the fee required by it to deliver the money upon positive identification. Miss Ellison delivered it. She had met Berne only a short time before the transaction in question; in a still shorter time he had introduced a man as being Steward. Under the rules of the company she was not warranted in accepting this introduction and identification; she should have required further identification. The written memorandum made by Mr. Doherty, the vice-president of the bank, was equivalent to notice to her as follows: "This man signed his name and I saw him do it. I do not care to identify him as being the person whom he represents himself to be." In rule 143 Miss Ellison was advised by the master of its view of personal identification in this language: "For example, the mere fact that John Doe, the payee, brings in Robert Roe, who is known to the paying clerk and that Roe states 'This gentleman is Mr. Doe' should not be considered as a complete personal identification by any means." As remarked in that rule, it by no means is satisfactory as identification for a person to introduce and identify another as being a certain party when that introduction and identification is based upon the identified party's own representations. Of course, Mr. Doherty saw the alleged Steward write his name; that did not add anything to Miss Ellison's knowledge, as she also could have seen him write the name. This was equivalent to no identification so far as Doherty is concerned, but was notice to Miss Ellison that Doherty had some reason for refusing to identify the person, which, if she had pursued, she would have found was that Doherty, a responsible banker of that city, had reason to be suspicious of Berne, and it is no answer to say that she had met these two parties casually and knew that they were receiving money orders similar to the ones here. If such were the case, it would always be possible for the telegraph companies, as car-

riers, to avoid their responsibility by asserting their honest belief that the impostor is the genuine party. The fact is that the agents of the telegraph company did not know who the party was, and they had no sufficient positive identification as required by the contract. Goodman had a right to rely upon the telegraph company's ability to see that positive identification was made. He relied upon the honesty of the man with whom he supposed he was dealing. He took every precaution he could to insure that the money was delivered by the telegraph company to the person named. In the last analysis he trusted the company to comply with the contract it undertook.

The court submitted the issue to the jury, and we think this was proper. We shall not undertake to collate all the authorities, but simply to set forth two cases of opposing views, and the authorities cited therein, for the position to be assumed by the courts of this state on this question. We refer to the case of Western Union Telegraph Company v. American State Bank of Burkburnett (Tex. Civ. App.), 277 S. W. 226. On December 27, 1921, a man by the name of Joe Spinks was residing in Los Angeles, California; he had formerly lived in Burkburnett, Texas, but had left there about one month before and had not returned. On that date a party presented himself at the window of the bank and deposited two checks payable to Joe Spinks. The bank gave Joe Spinks credit on its books for the amount, and he left his signature card. No officer or employee of the bank knew him, or knew that there was a man by the name of Joe Spinks; he had never done business with the bank. There was no proof in the record that Spinks, the party who deposited with the bank, was an impostor. The alleged Spinks sent a telegram to the bank requesting it to send by Western Union the amount of money on hand in the bank to his credit. The bank complied, but required positive identification. The telegraph com-

pany paid the party claiming to be Joe Spinks, after identification at Mexia. Afterwards the bank had to pay the money to the real Joe Spinks, and it sued the telegraph company therefor. The court there held that the bank was not entitled to recover from the telegraph company the money remitted by it in response to the telegram, and paid by the telegraph company to an impostor, where the part to whom the company paid the money was the party which the bank intended it should be paid to, even though he was not the legal claimant. The court in this case argued that the bank treated the impostor, Joe Spinks, as a depositor; that it had no knowledge of any other person, and did not intend to deal with any other person than the one with whom it had transactions as banker, and that, so far as the bank was concerned, he was already identified as the real Joe Spinks. However, the cases cited in the opinion uphold the contention of appellant, notwithstanding the difference between the facts in that case and the facts in this case.

Goodman was satisfied that the Steward he had dealt with in New York and New Jersey was an honest man, and his transactions with him had been satisfactory. He did not know him except by business correspondence. There are thousands of transactions being consummated daily throughout this country where the parties deal with each other without sight or without any means of identification. The telegraph company sets itself up as capable, competent, ready, able, and willing to make these positive identifications. If the testimony of Steward of Reno, Nevada, is to be believed, the money was paid to an impostor, and not to W. M. Steward, upon slight investigation and practically no identification.

Another leading case supporting this contention is the case of Samuel v. Cheney, 135 Mass. 278, 46 Am. Rep. 467. But in this case there was no special contract for positive identification. This was a suit against the ex-

press company as a common carrier for delivering goods to the wrong person.

The case and line of authorities which we adopt is that of Pacific Express Company v. Shearer, 160 Ill. 215, 43 N. E. 816, 37 L. R. A. 177, 52 Am. St. Rep. 324, in which Shearer & Co. were dealing with one J. C. Stubblefield who was buying cattle in Kansas, Missouri, and Texas, and to whom, on his application, Shearer & Co. made advances in money by express and by drafts. In April, 1888, Stubblefield was at Chetopa, Kansas, and telegraphed Shearer & Co. at Chicago, Illinois, for seven hundred dollars. It was sent to him by a draft. He was identified by a bank and received the money. A year later Stubblefield again arrived in Chetopa, did not register, and left town the following day. On the same train, another man came to Chetopa calling himself J. C. Stubblefield; he went to a hotel different from one the real Stubblefield patronized. The real Stubblefield left the following morning, as stated, and the impostor exchanged several telegrams with Shearer & Co. in the name of J. C. Stubblefield. In the telegrams was one to express him four thousand dollars. He thereupon arranged for a heavy shipment of cattle. Two days later he appeared at the office of the company and asked for a package for J. C. Stubblefield. He handed the agent the telegram received by him, in response to his, from Shearer & Co., stating the amount of money in the packages, and was identified by the landlord of the hotel. The impostor then left town. The imposition was discovered when the real Stubblefield returned to Chicago, the place of business of Shearer & Co. Under these facts the express company was held liable; the court saying that the strict liability of the common carrier to deliver to the proper person shall in all cases be rigidly enforced, and in no way lessened. That was an express company case for delivery of money, and there was no specific contract for a positive identifica-

tion. See, also, 3 Hutchinson, Carriers (3 Ed.), section 673.

The risk of assuming to positively identify the real party in a case like the one at bar is that of the telegraph company; the company cannot discharge the contract, and cannot even discharge the common-law obligation by accepting a party's statement as to his identity. At least in this case it was a question for the jury. There are numerous authorities for each position, but they are mainly based upon contracts different from the one here under review. However, we have decided that, in view of the strict rule of common law, amplified by the very rigid contract entered into by the telegraph company, we will not set ourselves at war with the common-law rule by adopting a rule which would shift the liability of the carrier to the party who pays the money for the specific purpose of having a positive identification when his property is to be delivered to another, unknown to him except by correspondence. Presumably the company charged, and Goodman paid, for the special service to be rendered by which the carrier became an insurer of delivery of the money.

The telegraph company took a chance when it paid its money to an impostor. This is true if the evidence of Steward of Reno, Nevada, is to be believed. The jury evidently credited it. It was warranted in concluding that the agents of the telegraph company were negligent and did not comply with the high degree of care imposed by the law and the contract.

We think the instructions granted the telegraph company were as full and favorable as it could possibly have requested, under the rule which we have announced.

Affirmed.