Sandra ADICKES, Plaintiff-Appellant,

v.

S. H. KRESS AND COMPANY, Defendant-Appellee.

No. 76, Docket 31262.

United States Court of Appeals
Second Circuit.

Argued Oct. 16, 1967.

Decided Dec. 27, 1968.

Dissenting Opinion March 26, 1969.

Certiorari Granted May 5, 1969.
See 89 S.Ct. 1635.

**122**

Eleanor Jackson Piel, New York City, for appellant.

Sanford M. Litvack, New York City (Donovan Leisure Newton & Irvine, New York City, of counsel, James R. Withrow, Jr., Alfred H. Hoddinott, Jr., New York City, on the brief), for appellee.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

MOORE, Circuit Judge:

The facts of this case are not in dispute. Plaintiff-appellant is a school teacher and resident of New York. In the summer of 1964, she volunteered to teach Negro students in a Mississippi Freedom School. On August 14, 1964, plaintiff, accompanied by six Negro students, entered the Hattiesburg, Mississippi, public library and requested the use of the library facilities. This request was refused, and they were told to leave. When they refused, the police were summoned, and the library was closed by the Chief of Police.

After their eviction from the library, plaintiff and the students proceeded to the Woolworth store in Hattiesburg for the purpose of eating lunch. Since the Woolworth store was crowded, they went instead to the Kress store, sat in booths near the lunch counter and sought to be served. Plaintiff, a Caucasian, admitted that one of the reasons the group chose Kress was that it served Negroes, and Kress claims to be a leader in the recognition of civil rights in the South. However, the waitress at the Hattiesburg store, acting under the orders of the store manager, took the orders of the Negroes but refused to serve plaintiff because she was in their company. According to the plaintiff, the waitress stated, "We have to serve the colored, but we are not going to serve the whites that come in with them." After she was refused service, plaintiff and the students left the store. Plaintiff's movements were under surveillance by the Hattiesburg police from the time that she and the students left the library, and as the group left the Kress store she was arrested and jailed by the police on a vagrancy charge.

Plaintiff brought this action for damages against Kress in the United States District Court for the Southern District of New York, alleging that she was discriminated against because of her race in violation of the equal protection clause of the Fourteenth Amendment and in violation of the Civil Rights Act

of 1871, 42 U.S.C. § 1983, which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

As a second cause of action, plaintiff alleged that there was a conspiracy between Kress and the Hattiesburg police to refuse to serve her and to arrest her as she left the store. However, except for the facts given above, plaintiff presented no relevant facts tending to support this conspiracy claim. She asked damages of $50,000 on the first claim and $500,000 on the conspiracy count.

Kress moved for summary judgment, pursuant to Fed.R.Civ.P. 56, with respect to both claims in the complaint. On February 26, 1966, Judge Bonsal denied the motion with respect to the first cause of action, granted defendants summary judgment on the conspiracy claim, and permitted plaintiff to amend the complaint. 252 F.Supp. 140 (SDNY 1966). Plaintiff appeals from these orders. After an amended complaint was filed, a pre-trial order specifying the issues to be tried and the witnesses to be called was stipulated to by the plaintiff and entered by Chief Judge Ryan on August 2, 1966. Trial commenced before Judge Tenney and a jury on February 14, 1967, and at the close of plaintiff's case, a verdict was directed for defendant. Plaintiff appeals from the judgment entered on this verdict.

### I.

Kress' motion for a directed verdict at the end of plaintiff's case was granted for failure to make out a prima facie case of discrimination in violation of the Fourteenth Amendment [1] and Section 1983. In determining the triable issues, both Judge Tenney and (then) Chief Judge Ryan followed the opinion handed down by Judge Bonsal which held that for plaintiff to succeed on the merits she had to show some "state action" or state involvement in the alleged discrimination because purely private discrimination is not prohibited by § 1983 or the Fourteenth Amendment. Specifically, Judge Bonsal held that plaintiff must prove at the outset that:

(1) a custom existed on August 14, 1964, in the State of Mississippi and in Hattiesburg of refusing service in restaurants to whites in the company of Negroes, and

(2) this custom was enforced by the State of Mississippi pursuant to Mississippi Code Section 2046.5,[2] a criminal

---

1. Sections 1 and 5 of the Fourteenth Amendment read as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

"Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

2. *"Mississippi Code, Section 2046.5 (1956).* *"Business customers, patrons or clients— right to choose—penalty for violation.*

"1. Every person, firm or corporation engaged in public business, trade or profession of any kind whatsoever in the State of Mississippi, including, but not restricted to, hotels, motels, tourist courts, lodging houses, restaurants, dining room or lunch counters, barber shops, beauty parlors, theatres, moving picture shows, or other places of entertainment and amusement, including public parks and swimming pools, stores of any kind wherein merchandise is offered for sale, is hereby authorized and empowered to choose or select the person or persons he or it

trespass statute. Judge Bonsal also intimated that plaintiff would have to establish that the store manager knew of, and acted pursuant to, § 2046.5 in refusing plaintiff service. Judge Tenney did not reach this latter point as he ruled that plaintiff had failed to prove that such a custom existed or that it was enforced under § 2046.5.

At the trial plaintiff testified that in her opinion it was the custom and usage in Hattiesburg not to serve white persons in the company of Negroes. However, plaintiff had never been in the State of Mississippi prior to June 1964 and had never visited Hattiesburg until July of that year. She did not have any personal knowledge of facts that would tend to show that such a custom existed. And each of the three students called by plaintiff as witnesses testified that they knew of no instances in which a white person had been refused service in Hattiesburg, Mississippi, while in the company of Negroes who were offered service. This failure of proof is not strange in light of the fact that Negroes only recently had been served in such establishments on an integrated basis.

## II.

One day before trial, plaintiff notified defendant that she intended to have two expert witnesses testify on the relevant customs and usages in Mississippi and Hattiesburg. The District Court sustained Kress' objection to these witnesses testifying on the ground that plaintiff had totally failed to abide by the pre-trial order requiring "prompt" notice to opposing counsel if any additional expert witnesses were to be called. The exclusion of these witnesses was within the trial court's discretion. Thompson v. Calmar S. S. Corp., 331 F. 2d 657, 662 (3rd Cir.), cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964); Clark v. Pennsylvania RR., 328 F.2d 591, 594–595 (2d Cir. 1964).

## III.

The proof presented by plaintiff was clearly insufficient to prove "custom, or usage, of any State" within the meaning of § 1983. The statute requires that the discriminatory custom or usage be proved to exist in the locale where the discrimination took place, and in the State generally. Plaintiff's proof on both points was deficient. It is true that in 1956 the Mississippi legislature passed, in addition to the trespass statute referred to above, Mississippi State Senate Concurrent Resolution No. 125 condemning and protesting the Supreme Court's school integration cases (Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)), and a resolution, found in Miss.Code § 4065.3, directing the entire executive branch of government and all persons responsible thereto, including the police, to give effect to the Senate

desires to do business with, and is further authorized and empowered to refuse to sell to, wait upon or serve any person that the owner, manager or employee of such public place of business does not desire to sell to, wait upon or serve; provided, however, the provisions of this section shall not apply to corporations or associations engaged in the business of selling electricity, natural gas, or water to the general public, or furnishing telephone service to the public.

"2. Any public place of business may, if it so desires, display a sign posted in said place of business serving notice upon the general public that 'the management reserves the right to refuse to sell to, wait upon or serve any person,' however, the display of such a sign shall not be a prerequisite to exercising the authority conferred by this act.

"3. Any person who enters a public place of business in this state, or upon the premises thereof, and is requested or ordered to leave therefrom by the owner, manager or any employee thereof, and after having been so requested or ordered to leave, refuses so to do, shall be guilty of a trespass and upon conviction therefor shall be fined not more than five hundred dollars ($500.00) or imprisoned in jail not more than six (6) months, or both such fine and imprisonment.

"4. If any paragraph, sentence, clause, phrase, or word of this act shall be held to be unconstitutional for any reason, such holding of unconstitutionality shall not affect any other portion of this act."

Concurrent Resolution, described as the "Resolution of Interposition." See also Miss.Code § 2056(7), a broad conspiracy statute passed in 1954 which, *inter alia*, makes it a crime to conspire to overthrow or violate the segregation laws of the State. However, these 1956 enactments are clearly insufficient by themselves to prove that in 1964 Mississippi had a custom of separating the races in restaurants. Williams v. Howard Johnson's Inc., 323 F.2d 102, 106 (4th Cir. 1963); Comment, 50 Cornell L.Q. 473, 494 (1965). The trespass statute, Miss.Code § 2046.5, is the only enactment not dealing with school integration and it, by itself, sheds no light on Mississippi customs and usages. Since plaintiff failed to prove custom or usage, we do not have to decide whether she also had to prove that the custom or usage was enforced by a state statute. See United States v. Guest, 383 U.S. 745, 761, 774, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (concurring opinions of a majority of the Court indicating that such a showing of "state action" may not be necessary).

### IV.

Plaintiff also contends on appeal that, assuming she has failed to prove the existence of a discriminatory state custom, she has nevertheless shown that she was discriminated against in violation of § 1983 because the refusal to serve her was "under color" of the state trespass statute, Miss.Code § 2046.5. The "under color" of law provision in § 1983 has been construed to mean the same as "state action" under the Fourteenth Amendment. United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The state action concept has been expanding over the years, but some state involvement in the racial discrimination has always been required. See Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Lombard v. State of Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L. Ed. 1161 (1948); see generally Silard, A Constitutional Forecast: Demise of the "State Action" Limit on the Equal Protection Guarantee, 66 Colum.L.Rev. 855 (1966); Comment, 50 Cornell L.Q. 473 (1965); Henkin, Shelley v. Kramer: Notes for a Revised Opinion, 110 U.Pa. L.Rev. 473 (1962); Van Alstyne & Karst, State Action, 14 Stan.L.Rev. 3 (1961); Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083 (1960). No state involvement in the discrimination having been shown, plaintiff failed to prove a violation of § 1983.

### V.

This brings us to plaintiff's argument that the requisite state action may be found solely from the state encouragement of discrimination inherent in Miss.Code § 2046.5. This argument is based on the recent case of Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), which upheld the California Supreme Court's decision that Art. 1, § 26 of the California Constitution was unconstitutional under the Fourteenth Amendment. The Mulkeys had sued Reitman alleging that he had refused to rent to them an apartment solely on account of their race, in violation of California open housing legislation, Cal.Civ.Code §§ 51, 52, passed in 1959. Defendant moved for, and was granted summary judgment on the ground that §§ 51, 52 had been rendered null and void by the recent amendment to the California Constitution. Section 26, initiated as Proposition 14, provided that the state shall not "deny, limit or abridge * · * * the right of any person * * * to decline to sell, lease or rent" his property "to such person or persons as he, in his absolute discretion, chooses." This amendment was added pursuant to an initiative and referendum vote in 1964, and was intended to repeal anti-discrimination housing legislation passed in 1959, 1961 and 1963.

The Mulkeys appealed to the California Supreme Court which reversed the grant of summary judgment on the ground that § 26 violated the equal protection clause of the Fourteenth Amendment. The Supreme Court of the United States affirmed, agreeing with the California court that "the prohibited state involvement could be found 'even where the state can be charged with only encouraging,' rather than commanding discrimination." 387 U.S. at 375, 87 S.Ct. at 1631. According to the Court, the California court was justified in concluding that § 26 did not merely repeal certain statutes, restoring the status quo ante, but "was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State." 387 U.S. at 381, 87 S.Ct. at 1634.

While plaintiff is not seeking to have the enforcement of Miss.Code § 2046.5 declared unconstitutional, she points out that the main issue before the Court in *Reitman* was whether § 26 involved the state in the otherwise private discrimination and that the Supreme Court held that it did. We must, therefore, decide whether the State of Mississippi by passage of § 2046.5 "encouraged" the discrimination practiced by Kress. We are of the opinion that it did not.

In *Reitman* the California court was faced with a much publicized constitutional amendment which repealed prior anti-discrimination legislation and set up the right to discriminate as a policy of the state. The Supreme Court specifically noted that "the right to discriminate, including the right to discriminate on racial grounds, was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of state government. Those practicing racial discrimination need no longer rely solely on their personal choice. They could now invoke express constitutional authority, free from all censure or interference of any kind from official sources." 387 U.S. at 377, 87 S.Ct. at 1632. In the instant case,

Mississippi has passed a statute which, as to restaurateurs at least, merely restated the common law rule allowing them to serve whomever they wished. See R. v. Rymer, 2 Q.B. 136, 40 L.J.M.C. 108 (1877); 21 Halsbury, Laws of England § 941 at 447 (3rd ed. 1957). See also Williams v. Howard Johnson's Restaurant, 268 F.2d 845 (4th Cir. 1959). The common law is presumed to apply in Mississippi. See Western Union Telegraph Co. v. Goodman, 166 Miss. 782, 146 So. 128 (1933). Furthermore, in *Reitman*, the Supreme Court did not, and the California court did not, "rule that a State may never put in statutory form an existing policy of neutrality with respect to private discriminations." 387 U.S. at 376, 87 S.Ct. at 1631. At least as applied to this case, we think the state must do more than it has done for the required state action to be found.

## VI.

Although the denial of service to plaintiff probably constituted a violation of the Civil Rights Act of 1964, there is no provision for a damage remedy in that statute. Nor can the violation of that Act form the basis of a claim under § 1983 since the injunctive remedy in that Act is the exclusive avenue of redress. 42 U.S.C. § 2000a–6(b); United States v. Johnson, 269 F.Supp. 706 (N.D.Ga.1967), prob. juris. noted, 389 U.S. 910, 88 S.Ct. 241, 19 L.Ed.2d 258; reversed, 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132, on ground that proprietors or owners were not involved—only outsiders. Plaintiff's reliance on that Act is therefore misplaced.

## VII.

Plaintiff also contends that it was improper for Judge Bonsal to grant summary judgment on the conspiracy cause of action. Plaintiff's claim was wholly conclusory; she alleged no facts that would tend to suggest a conspiracy; and the chances of her proving such a conspiracy at the trial were nil. The grant of summary judgment was there-

fore proper. Birnbaum v. Trussell, 347 F.2d 86 (2d Cir. 1965); Powell v. Workmen's Comp. Board, 327 F.2d 131, 137 (2d Cir. 1964).

Affirmed.

WATERMAN, Circuit Judge (dissenting):

I dissent and would remand for further proceedings below. See Achtenberg, Adickes et al. v. State of Mississippi, 393 F.2d 468 (5 Cir. 1968).

Miss Adickes was engaged in "protected activity"; Section 2046.5 of the Mississippi Code encouraged the defendant's employees to make the invidious discrimination; and her arrest upon her immediate exit from the store on the unsupportable trumped-up charge of vagrancy was a flagrant misuse of the State's criminal process in order to perpetuate by subterfuge Mississippi's well-known practice of preventing Caucasians and Afro-Americans from grouping themselves together in company in places of public resort.

I reserve the right to file an enlarged opinion at a later date.

WATERMAN, Circuit Judge (dissenting):

I respectfully dissent.

### I.

I would reverse the judgment below and remand for further proceedings in the district court. I agree with my brothers' discussion in Part II of their majority opinion and with the result they reached there. I also agree with the result reached by them in Parts VI and VII. I must dissent, however, from the remainder of the majority opinion and from the order affirming the judgment for the defendant that was entered after the jury returned the defendant's verdict which the trial court had ordered.

In my view, the initial rulings on defendant's motion for summary judgment were erroneous, 252 F.Supp. 140. As a direct consequence of these erroneous rulings to which Chief Judge Ryan and Judge Tenney adhered, Chief Judge Ryan at the pretrial conference he held, and Judge Tenney at trial, deprived plaintiff of any opportunity effectively to present or to prove her case. Inasmuch as my brothers now approve the initial rulings and those made subsequent thereto, bottomed thereon, I believe it essential for me to file a rather exhaustive opinion, setting forth my position.

Plaintiff's claim for damages against Kress was based upon an alleged violation by Kress of the Civil Rights Act of 1871, 42 U.S.C. § 1983. In support of her claim, plaintiff contended that Kress discriminated against her "under the color" of either "custom" or "statute, ordinance, [or] regulation," i. e. "law" of the State of Mississippi, or both. These two grounds for recovery are separate and distinguishable from each other; they require different kinds of proof and they deserve individual attention and treatment. In Part II of this opinion I propose to examine the proof required to make a prima facie case "under the color of custom" allegation, and in Part III, I will explore the proof necessary to make one "under the color of law" allegation. The relevant discussions will examine the errors of the lower court judges and how these errors hindered the development of plaintiff's case.

### II.

Although the Civil Rights Act of 1871 was the subject of extensive and intensive Congressional debate (see, The Reconstruction Amendments' Debates, 484–570 (1967),[1] the exact dimensions of the term "custom" appear to have received scant attention. See *id.;* see also, *id.* at

1. The Reconstruction Amendments' Debates is a 1967 publication of the Virginia Commission on Constitutional Government (now defunct). The edition is comprised of edited reprints and relevant legislative history of the important contemporary Senate and House debates discussing the 13th, 14th, and 15th Amendments and the related Reconstruction bills and acts of Congress.

161–171, 174–183, 186–191, 198–209, 210, 584, 586, 609. Considering the passions aroused by the Reconstruction Amendments and the Civil Rights Bills and having in mind the close scrutiny Congress gave each Amendment and bill, it seems strange that more was not said in Congress about the meaning and scope of the term "custom." Of course, the logical reason for this must be that "custom" had a reasonably well fixed and definite meaning at the time the Civil Rights Act of 1871 was debated and enacted. The definition in Black's Law Dictionary 461 (4th Ed. 1951) defining "custom" is

> A usage or practice of the people which, by common adoption and acquiescence, and by long and unvarying habit, has become compulsory, and has acquired the force of a law with respect to the place or subject-matter to which it relates. Adams v. [Pittsburgh] Insurance Co., 95 Pa. [348] 355, 40 Am.Rep. 662 (1880); King v. Shelton, Tex.Civ.App., 252 S.W. 194, 195; Conahan v. Fisher, 233 Mass. 234, 124 N.E. 13, 15; Lawrence v. Portland Ry., Light & Power Co., 91 Or. 559, 179 P. 485, 486; U.S. Shipping Board Emergency Fleet Corporation v. Levensaler, 53 App.D.C. 322, 290 F. 297, 300.

This definition appears to be a definition that would have been acceptable to the legislators in 1871. See The Reconstruction Amendments' Debates, 164–65, 176–77, 182–83, 198, 204–05, 210, 216, 492–93, 498, 519, 553–54, 584, 586 (1967); cf. Civil Rights Cases, 109 U.S. 3, 16–17, 3 S.Ct. 18, 27 L.Ed. 835 (1883); 17 Corpus Juris, Customs and Usages § 1–6 (1919); see also, Vol. 10A, Words and Phrases, Perm.Ed. Custom Cf. Wilcox v. Wood, 9 Wend. (N.Y.) 346, 349.

Accepting this definition as correct and compatible with Section 1983, it becomes immediately apparent that the practice Judge Bonsal ordered plaintiff to prove could not possibly qualify as a "custom" of the State of Mississippi or any part thereof. As the majority implicitly admits, a custom of not serving white persons who were in the company of Afro-Americans could not be proven because it was only after the Civil Rights Act of 1964 became law that Afro-Americans had an opportunity to be served in Mississippi "white" restaurants. See, e. g. N.A.A.C.P. v. Thompson, 357 F.2d 831, 835 (5 Cir.), cert. denied sub nom. Johnson v. N.A.A.C.P., 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58 (1966); Dilworth v. Riner, 343 F.2d 226 (5 Cir. 1965). Consequently the requirement that the practice intended to be proven as a "custom" be of "long and unvarying habit" could not be satisfied if, in fact, the relevant practice required to be proved by Section 1983 was that delineated by Judge Bonsal.

In making his ruling Judge Bonsal rejected plaintiff's assertion of the relevant Mississippi practice which had gained the status of a "custom" there. Plaintiff contended that the practice of fostering the segregation of races in places of public assembly was the relevant "custom." I agree. This longstanding practice which has been the subject of numerous writings, (see, e. g., J. Silver, Mississippi: The Closed Society (1964); see, U.S. Senator Edward M. Kennedy, Book Review of "Coming of Age in Mississippi," by Anne Moody, The New York Times Book Review, January 5, 1969, at 5, col. 2,) and the root of many legal controversies (see e. g. United States v. Price 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); Achtenberg v. Mississippi, 393 F.2d 468 (5 Cir. 1968); cf. Sunflower County Colored Baptist Association v. Trustees of Indianola M.S.S.D., 369 F.2d 795 (5 Cir. 1966)) is manifested in many ways. The refusal to serve the plaintiff is but one illustration.

Civil Rights laws, especially the Civil Rights Act of 1964, and the pressures exerted by local and national civil rights organizations have made it more difficult to refuse to serve Afro-Americans at what was formerly an all-white lunch area. However, by more subtle means, restaurant owners can and do let Afro-

Americans and their white friends know that the ancient custom of racial segregation is not yet dead. This information was conveyed to the mixed group here by the simple expedient of refusing to take the order of a white woman who would flaunt custom and, in a dining establishment in the center of Hattiesburg, sit down at the same table with and plan to break bread with young Afro-American friends.[2] The end result of these tactics and of other similar tactics was to cause by, for instance, the act here, the continued discriminatory separation in 1964 of the Afro-American diners from the white diners within the area of a so-called "integrated" eating establishment by prohibiting individual members of the races from dining together at the same tables or booths. Thus the custom, which has existed in the "closed society" of Mississippi since, admittedly, at least 1880, of not permitting the races to mix socially was reinforced and perpetuated.

Plaintiff's proffered evidence of the existence of a custom of separating the races in places of public assembly, Mississippi State Senate Resolution No. 125 (1956); Miss.Code § 4065.3 (1956); Miss.Code § 2056.7 (1954), does not conclusively establish the fact that the custom of keeping the races separated existed in 1964. However, in the light of the cases which have involved one aspect or another of the custom, e. g., City of Greenwood v. Peacock, *supra;* United States v. Richberg, 398 F.2d 523 (5 Cir. 1968); N.A.A.C.P. v. Thompson, *supra;* Brown v. City of Meridian, 356 F.2d 602 (5 Cir. 1966); Dilworth v. Riner, *supra;* cf. e. g., Sunflower County Colored Baptist Association v. Trustees of Indianola M.S.S.D., *supra;* Norton v. McShane,

332 F.2d 855 (5 Cir. 1964), *cert. denied,* 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); United States v. Faneca, 332 F.2d 872 (5 Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965), and the extensive writing concerning the general subject of segregation (see, e. g. Silver, *supra;* E. Kennedy, *supra*), the district court should have taken judicial notice of the *prima facie* fact that such a custom existed in Mississippi in 1964 and that the experience of the plaintiff was, *prima facie,* one illustration of the custom in action. See, e. g., Meredith v. Fair, 298 F.2d 696, 701 (5 Cir. 1962); United States ex rel. Goldsby v. Harpole, 263 F.2d 71 (5 Cir. 1959); Bullock v. Tamiami Trail Tours, Inc., 266 F.2d 326, 332 (5 Cir. 1959).

The error committed by Judge Bonsal in defining the relevant custom was compounded by his erroneous ruling that the relevant custom must be shown to exist both in the State of Mississippi and in Hattiesburg. Such proof is not required by Section 1983. Section 1983 only demands proof of a custom in the locality where plaintiff experienced the invidious racial discrimination. This proof could consist either of one or two types of evidence. First, plaintiff could produce evidence establishing the existence of a "general" custom which prevails throughout the State, see, e. g., Bodfish v. Fox, 23 Me. (10 Shep.) 90, 95; 39 Am.Dec. 611 (1843); see also Black's Law Dictionary 461 (4th Ed. 1951), and which, *a fortiori,* would be rebuttably presumed to exist as a custom in the locality where the discriminatory event occurred. Second, plaintiff could produce evidence that established the discriminatory practice to be a local custom prevailing only in the particular locality where plaintiff ex-

---

2. The courts must be attuned to the subtle discriminations attempted by those intent on frustrating national policy; otherwise the rights guaranteed by the Constitution to all Americans will be hollow indeed. In examining possible discriminatory action the courts should remember:

One intent on violating [laws prohibiting discrimination] cannot be expected to declare or announce his purpose.

Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive—for we deal with an area in which "subtleties of conduct * * * play no small part." Holland v. Edwards, 307 N.Y. 38, 45, 119 N.E.2d 581, 584, 44 A.L.R.2d 1130 (1954) (Fuld, J.).

perienced the discrimination. See, e. g. 1 Blackstone, Commentaries 74; Black's Law Dictionary, *supra*. Judge Bonsal's ruling to the extent that it required proof beyond that stated above was clearly erroneous and greatly hindered the presentation of plaintiff's case.

The lower court also erred in holding that the plaintiff, in order to satisfy the requirement of "state action," had to prove that the "custom" was enforced by means of Section 2046.5. By definition custom is a practice that has the force of law. Black's Law Dictionary, *supra;* see, e. g., The Reconstruction Amendments' Debates, *supra*, at 553–54; Civil Rights Cases, *supra*. When a practice has the *force* of law the practice, i. e., the custom, will be enforced by the imposition of some type of sanctions upon those who would violate the custom. However, since it is custom—unwritten law—with which we are dealing, the sanctions imposed for violation of the custom would not normally be spelled out as such in a written statutory code, or body of ordinances, or set of regulations. Enforcement of custom may be accomplished by a variety of methods "within the law." For instance, here the custom could be enforced through the use of Section 2046.5, if, presumably, the restaurant operator complained directly to the police, see, e. g. Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed. 323 (1963); Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L. Ed.2d 338 (1963). But it could also be enforced by other means as by arresting custom violators for breach of the peace, see, e. g., Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Wright v. Georgia, 373 U.S. 284, 83 S. Ct. 1240, 10 L.Ed.2d 349 (1963); Taylor v. Louisiana, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); Brown v. City of Meridian, *supra*, or arresting violators on charges of disorderly conduct, see, e. g., Pierson v. Ray, 352 F.2d 213 (5 Cir. 1965) *reversed in part*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Nesmith v. Alford, 318 F.2d 110 (5 Cir. 1963), or arresting, as here, on charges of vagrancy, see, e. g. Achtenberg, Adickes et al. v. Mississippi, *supra;* Robertson v. Johnston, 376 F.2d 43 (5 Cir. 1967), or by official harassment short of arrest, as, for instance, officer surveillance. The defendant hints of the possibility that those mixed racial groups who would dine together, as Miss Adickes and her Afro-American students, may not be the only persons who feel the force of sanctions imposed for the violation of custom. Restaurant operators such as Kress could be harassed, threatened with license revocation or unnecessary but disruptive health inspections etc., if they violate custom by serving such mixed racial groups.[3] Endless is the variety of ways by which public officials can ensure that custom has the force of a law. See Lombard v. Louisiana, *supra*. Of course, when custom is perpetuated and enforced only through the use of strictly private pressures [4]

3. The activities of the Mississippi State Sovereignty Commission, a curious arm of the state legislature, and of the White Citizens Council are of interest when one has the duty to probe the official or state involvement in the enforcement of the custom of segregating the races. It appears to be common knowledge that, in addition to its own activities promoting segregation, the Mississippi State Sovereignty Commission, an agency created in 1956 and financed by state tax revenues, used a part of its funds to finance some of the activities of various groups, including the White Citizens Council, which promote adherence to the ancient custom of proscribing the mixing of the races in places of public assembly; and that these groups, especially the White Citizens Council, use economic and social power to pressure those who might attempt to disregard custom into adhering to custom. See, generally, J. Silver, Mississippi: The Closed Society, 8, 32, 39–40, 42, 43, 65, 79, 94, 97, 110, 133, 151, 217 (1964).

4. Obviously any group would not be using state funds when so engaged. See note 3, *supra*.

with violators experiencing the icy chill of social ostracism administered by members of a particular stratum of society, such a practice, although a way of life that exists within a State, would not be one that is classified as being a custom "of a State."

Nevertheless, one need not be confused between a social stratum's way of life and the custom of a State. To prove that a plaintiff is entitled to proceed in an action for redress under Section 1983, a plaintiff need but present a *prima facie* case that the State, or its instrumentalities, or its agencies, or its individual officers, directly or indirectly, lend either their authority, or the threat of power or the aura of prestige to the perpetuation and enforcement of the custom. See, e. g. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Garner v. Louisiana, *supra,* 368 U.S., at 176–182, 82 S.Ct. 248 (Douglas, J., concurring) (1961); Baldwin v. Morgan, 287 F.2d 750, 756–760 (5 Cir. 1961). See generally, Comment, State Action Under the Equal Protection Clause of the Fourteenth Amendment and the Remaining Scope of Private Choice, 50 Cornell L.Q. 472 (1965). And, a custom, if well known, is provable by the taking of judicial notice of it, as is also, if well known, the state-sponsorship thereof. If the plaintiff presents a prima facie case that there is the discriminatory custom and that proprietors of business establishments understand that the State seeks to preserve that custom, then the plaintiff has established plaintiff's initial burden of proof under Section 1983. So, if plaintiff establishes the existence of an understood state "custom" then it follows that, *prima facie,* the eating establishment operator, Kress, acted pursuant to that custom when it refused to serve Miss Adickes. See, Lombard v. Louisiana, *supra;* Garner v. Louisiana, *supra* 368 U.S. at 181, 82 S.Ct. 248

(Douglas, J., concurring); Bullock v. Tamiami Trail Tours, Inc., *supra;* cf Rolfe v. County Board of Education of Lincoln County, 391 F.2d 77, 80 (6 Cir. 1968). If Kress acted pursuant to a state-sponsored or state-encouraged custom, it has subjected itself to possible liability to Miss Adickes under Section 1983. Consequently not only did plaintiff state a good cause of action under Section 1983 by alleging in Count I that Kress discriminated against her under the color of a custom but, in all likelihood, she would have been able to prove the cause of action at trial if she had not been restricted in her proof of its scope by erroneous pre-trial rulings of the lower court.

### III.

Plaintiff also alleged in her complaint that Kress violated Section 1983 because its refusal to serve her was "under the color of law." This claim is correctly recognized by the majority as separate from the "under the color of custom" claim but the majority rejects it on the ground that plaintiff has failed to show any state involvement in the discrimination practiced by Kress. Since I believe that a *prima facie* case of "state action" was proved, I file my dissenting views.

According to the majority, the Reitman v. Mulkey, *supra,* analysis suggested by plaintiff is inapplicable because Mississippi in enacting Section 2046.5 of the Mississippi Code only restated the common law and "put in statutory form an existing policy of neutrality with respect to private discriminations." [5] Premised upon this belief, the majority holds that "the state must do more than it has done for the required state action to be found" (p. 756). My ground for disagreement with the majority's conclusion that "state action" is lacking here is premised on what seems to me to be an incomplete analysis of the common law and of the nationally-known history of Mississippi's past policies with respect to "private discrimination."

5. Reitman v. Mulkey, 387 U.S. 369, 376, 87 S.Ct. 1627, 1631, 18 L.Ed.2d 830

(1967) quoted in Part V of the majority opinion.

Certainly common law rule, a rule presumed to apply in Mississippi, see Western Union Telegraph Co. v. Goodman, 166 Miss. 782, 146 So. 128 (1933), is not completely unequivocal in pronouncing that a restaurateur could serve whomever he wished. Blackstone stated:

> \* \* \* if an innkeeper, *or other victualler,* hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal assumpsit an action lies against him for damages if he, without good reason, refuses to admit a traveler. (Emphasis supplied.)

3 Blackstone Commentaries 164 (Lewis ed. 1902) at 166. See also Letaiyo—W. Moore v. Wood, 58 Misc.2d 170, 294 N.Y.S.2d 1009 (S.Ct. 1968); Ferguson v. Gies, 82 Mich. 358, 46 N.W. 718, 9 L.R.A. 589 (1890). In Tidswell, The Innkeeper's *Legal Guide* 22 (1964) a "victualling house" is defined as a place "where people are provided with food and liquors, but not with lodgings," and in 3 Stroud, Judicial Dictionary (1903) as "a house where persons are provided with victuals, but without lodging." In the shorter Oxford English Dictionary (1939), "victualler" is defined as "A purveyor of victuals or provisions; *spec.* the keeper of an eating-house, inn, or tavern; a licensed victualler." And see Friend v. Childs Dining Hall Co., 231 Mass. 65, 120 N.E. 407, 5 A.L.R. 1100 (1918). Therefore, a "restaurateur" is the equivalent of a "victualler" and, insofar as Blackstone's Commentaries may be the "common law" of the United States, the Blackstone common law rule applicable to a victualler and a "victualling house" is applicable to a restaurateur and a place where food is served for consumption on the premises. It, if applicable, requires the restaurateur to serve all persons unless he can show "good reason" for denying service.

Most assuredly the common law allows the restaurateur to refuse to serve a person for good reason. "Good reason" of course means that the restaurateur may refuse to serve a person who is "\* \* \* unclean, untidy, intoxicated, or affected by disease \* \* \*" (Noble v. Higgens, 95 Misc. 328, 158 N.Y.S. 867–868 (1961)); see also Regina v. Rymer, 2 Q.B. 136, 40 L.J.M.C. 108 (1877); but a refusal of service based upon racial discrimination is just as assuredly not a "good reason." *Id.*; see Letaiyo—W. Moore v. Wood, *supra.* Therefore, to the extent that Mississippi Code Section 2046.5 allows a restaurateur a full discretion for any peculiar idiosyncrasy or prejudice of his own to pick and choose whom he wishes to serve, I submit that Mississippi has drastically changed the common law.

The majority's intimation that the passage of Section 2046.5 merely represented the placing into statutory form of an existing policy of neutrality toward private discrimination "defies history and common knowledge." Meredith v. Fair, 305 F.2d 343, 360 (5 Cir. 1962). Until Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and its progeny, Mississippi openly maintained a state policy of segregation and actively supported private racial discrimination. See, e. g., Meredith v. Fair, *supra,* and cases and materials cited in Part II of my dissent.

> Since racial discrimination as a straightforward state policy has been denied by the Constitution, there has followed a subtle but deliberate delegation of the enforcement of the policy to private hands. The legislative "repeal" of the common-law duties of innkeepers is only one recent example of a time-tested practice elsewhere manifest in the history of voting rights. \* \* \*.

W. Van Alstyne and K. Karst, State Action, 14 Stan.L.Rev. 3, 4 (1961). Miss. Code Section 2046.5 is nothing more than another legal subterfuge designed to avoid and to frustrate the federal constitutionally required policy of equal treatment of the races and the right of equal access to and enjoyment of the facilities available in public places and en-

terprises holding themselves out as "engaged in public business."

Although my brothers may believe that Miss.Code Section 2046.5 appears on its face to take a neutral position with respect to private racial discrimination, it is clear that, like Proposition 14 in Reitman v. Mulkey, *supra,* Section 2046.5 is an affirmative action taken by the State which is intended to encourage, authorize, and to continue to make legally possible private racial discrimination by the proprietors of businesses there listed. Additionally (and this shows that Section 2046.5 is even more declaratory of the state's determination to preserve racial discrimination than was demonstrable in Proposition 14), Section 2046.5 promises the discriminator the support of the police power of the State of Mississippi by authorizing the arrest for "trespass" of a person who refuses to leave a restaurant after being refused service irrespective of the reason for the refusal. Examination of the authorities, see, e. g., Reitman v. Mulkey, *supra*; Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); McCabe v. Atchison, Topeka & Santa Fe R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), leaves no doubt that the "state action" requirement is fulfilled in this case and that the State of Mississippi, by enacting Section 2046.5 has significantly involved itself in private discriminations.

The only remaining question is whether the relationship which occurred here between the "state action" and the private discrimination is sufficiently close to conclude that the defendant, Kress, acted under the "color of law." Miss Adickes was subjected to "state action" immediately after the racial discrimination, and her immediate arrest was condemned by the Judges of the Fifth Circuit, the Federal Appellate Court most cognizant of Mississippi law and custom. I maintain that I, in this dissent, and the plaintiff in her pleadings and at trial, have the right to rely upon the judgment of that Court and that it is not for Judges of the Second Circuit to deny Miss Adickes her day in court when the Judges of the Fifth Circuit have so demonstrably spoken. See Achtenberg, Adickes et al. v. Mississippi, *supra*; cf. Bernhardt v. Polygraphic Company of America, 350 U.S. 198, at 212, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring). I repeat the statement I made earlier in this case:

I dissent and would remand for further proceedings below. See Achtenberg, Adickes et al. v. State of Mississippi, 393 F.2d 468 (5 Cir. 1968).

Miss Adickes was engaged in "protected activity"; Section 2046.5 of the Mississippi Code encouraged the defendant's employees to make the invidious discrimination; and her arrest upon her immediate exit from the store on the unsupportable trumped-up charge of vagrancy was a flagrant misuse of the State's criminal process in order to perpetuate by subterfuge Mississippi's well-known practice of preventing Caucasions and Afro-Americans from grouping themselves together in company in places of public resort.

If plaintiff could show that Kress acted pursuant to the powers granted by Section 2046.5 to pick and choose whom it wished to serve then Kress was acting under the "color of law" and is liable under Section 1983. See, e. g., United States v. Price, *supra*; Burton v. Wilmington Parking Authority, *supra*; Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); see also cases summarized in Black, Foreword, "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69, 86 (1967). In establishing that Kress acted pursuant to powers granted by Section 2046.5 plaintiff, in order to establish a prima facie case, need not prove that Kress actually knew of Section 2046.5 specifically or of its penalties; all that need be proven by direct or circumstantial evidence is that the employees of Kress had knowl-

edge that under Mississippi law Kress did not have to serve Miss Adickes if she chose to be accompanied by her Negro friends. Cf. Reitman v. Mulkey, *supra;* Peterson v. City of Greenville, *supra;* Robinson v. Florida, 378 U.S. 153, 84 S. Ct. 1693, 12 L.Ed.2d 771.